GORDON, et al. *v.* PELAHATCHIE BROILER HATCHERY.

April 19, 1954

No. 39194          61 Adv. S. 14          71 So. 2d 769

*Montgomery & Varnado,* Belzoni, for appellants.

*O. B. Triplett, Jr.*, Forest, for appellee.

Ethridge, J.

Appellee, R. H. Fechtel, doing business as Pelahatchie Broiler Hatchery, brought this suit in the Circuit Court of Humphreys County against George J. Gordon and others, doing business as Belzoni Development Company. The declaration charged that on April 25, 1952, plaintiff sold and delivered to defendants 18,000 baby chickens at 12c each, and on May 2, 1952, 20,000 baby chickens at 12c each. and that of the total purchase price of $4,560, the defendants paid $2,160, leaving a balance due plaintiff-appellee of $2,400. The declaration had attached to it a statement of account and an affidavit.

The defendants, appellants here, George J. Gordon and other·, filed an answer and a counter-claim. They admitted the purchase by them of the baby chickens as

charged in the declaration, but denied that those sales were two contracts, and averred that the shipment of 38,000 baby chickens was a shipment of only part of the total contracted for; that appellee had agreed to sell appellants 56,000 more baby chickens, being their needs for the 1952 season, which agreement was breached by plaintiff. The defendants further averred that under their contract they were permitted to deduct 12c per chicken for all baby chickens that died, but not exceeding ten per cent of the shipment, and that 2,028 chickens had died out of the past shipment, leaving defendants owing the plaintiff on the shipment of 38,000 chickens only $2,156.64. In a counterclaim, the defendants averred that plaintiff had agreed to furnish them all of the baby chickens they needed for the calendar year and season of 1952; that it was agreed that the price would be fixed at the time each shipment was ordered; that on July 14, 1952, plaintiff and defendants agreed upon the shipment to defendants of 56,000 baby chickens at 13c each. The counterclaim charged that plaintiff had failed to comply with the contract initially made in the Spring of 1952, by failing to ship these 56,000 baby chickens, and averred that as a proximate result of that breach of contract, defendant lost profits of $3,443.48. Deducting the sum that the defendants admitted they owed plaintiff, $2,156.64, the defendants, counterclaimants, asked for a judgment against plaintiff for $1,286.84. The answer to the counterclaim denied any contract with the counterclaimants for the entire season of 1952, and denied a breach of any agreement. Plaintiff also pleaded that the contract as alleged by defendants was violative of the statute of frauds.

A trial on these issues was held in July 1953. Both sides introduced evidence as to the terms of the dealings and alleged agreements between them. The circuit court gave plaintiff, appellee, a peremptory instruction for the full amount sued for by him, $2,400. It therefore held

that appellants had no valid counterclaim. They here complain of that ruling.

The pertinent statute of frauds is Code of 1942, Section 268: "A contract for the sale of any personal property, goods, wares, or merchandise, for the price of fifty dollars or upward, shall not be allowed to be good and valid unless the buyer shall receive part of the personal property, goods, wares and merchandise, or shall actually pay or secure the purchase-money, or part thereof, or unless some note or memorandum, in writing, of the bargain be made and signed by the party to be charged by such contract, or his agent thereunto lawfully authorized."

Appellants' counterclaim is based on the contention that in April 1952 they made an oral contract with appellee-hatchery by which appellee would furnish to appellants all of the baby chickens which appellants would need in their business for the calendar year of 1952; that it was agreed that the market price of the chickens at the time a particular order was "booked" would be the price of same; that this was one entire agreement, and in April and May they purchased from the hatchery under this contract 38,000 chickens, which was such part performance of the agreement as to make it valid. In July they ordered under the April contract 56,000 chickens, appellants assert, at a price then agreed upon of 13c per chicken; but the hatchery would not deliver 56,000 chickens, and this constituted a breach of contract, for which appellants seek damages. In response to this counterclaim, appellee, plaintiff below, asserts that no such contract for the entire season was made in April 1952; that appellee simply delivered on order the 38,000 chickens which have not been paid for; that even if such a contract was made, according to the testimony of George J. Gordon, a partner in appellants' firm, the price of any shipments of chickens had to be fixed at the time of shipment by negotiation and agreement at that time; that therefore the contract was unenforce-

able as to the undelivered chickens, since it was wholly indefinite as to the price; and that the July agreement was oral and invalid under the statute. We think that appellee's position is correct.

Accepting appellants' testimony at its strongest, the original agreement between the parties amounted to this: the hatchery would supply the needs of appellants during the 1952 season up to 150,000 to 160,000 chickens, provided the parties could agree upon the price at the various times when orders should be subsequently made. There was no firm offer either to buy or sell a specific number of chickens, nor was there any agreement that the existing market price at a particular market or the fair value of the chickens should govern. The only testimony for appellants indicating any understanding as to price of future shipments of chickens was that of Gordon who testified: "Q. What was the original contract? A. The usual procedure is to set the price at the time of the bookings. That is what we understood. Q. Did the price of the baby chicks fluctuate? A. Yes, sir. Q. How far ahead were they booked? A. We booked them 30 days to six weeks ahead, and the price was set on them at that time."

In other words, Gordon said that the price of baby chickens fluctuated and that the parties would "set" the price on them at the time they were booked. He did not state that the price would be the market price at any particular market, and since there was no agreement as to that essential element, the contract asserted by appellants was unenforceable as to undelivered shipments. The applicable rule is stated in 77 C. J. S., Sales, Section 21, p. 621, as follows: "As a general rule, it is essential to a valid sale or contract of sale that the parties thereto, either expressly or impliedly, agree on and fix with reasonable certainty the price or consideration to be paid for the property sold, or provide some method or criterion by which it can be definitely ascertained, without

leaving anything to be determined by future agreement or negotiations between the parties in relation thereto; and in some jurisdictions these requirements are provided for by statute. If there is no agreed consideration or price there can be no valid contract of sale, . . .'' To the same effect are Elmore, Quillian & Company v. Parish Brothers, 170 Ala. 499, 54 So. 203 (1911); Risk v. Risher, 197 Miss. 155, 19 So. 2d 484 (1944). See also 77 C. J. S., Sales, Section 75 (b).

As previously stated, the hatchery shipped to appellants 38,000 chickens at an agreed price of 12c, in two shipments on April 25 and May 2. In July appellants, through their agent Everitt, gave an order for 56,000 chickens, but there was no agreement as to price. Everitt reported this to Gordon, and on July 14 Gordon talked over the telephone to McAuliffie, when it was agreed, Gordon said, that the shipment of 56,000 chickens would cost 13c each. On the next day, March 15, Gordon, acting for appellants, wrote appellee a letter as follows:

''Pursuant to our telephone conversation of yesterday, you will find enclosed our check for $2,156.64 which is payment in full on the 38,000 birds which you furnished us in April, computed as per our telephone agreement as follows:

''Number of birds raised and sold out of
the 38,000—35,972 at 12c ........................................................$4,316.64
''Less amount paid by check July 10, 1952 ................ 2,160.00

''Balance due, check attached ............................................ 2,156.64

''It is our present understanding that you will furnish us with 56,000 birds during the next three weeks as per schedule we agreed on of 20,000 on July 22nd, 18,000 each for the next two Tuesdays to be paid for when the birds are sold on the basis of the number of chickens raised.

''It is our understanding that this agreement holds good on up to and including 10% of our net mortality, exclusive of free chicks, and that this agreement will be

in effect on every future purchase of baby chicks from your hatchery.''

██ ██ This letter failed to make any provision whatever for the price of the 56,000 chickens. Moreover, this alleged agreement for the July shipment, relied upon by appellants, makes three substantial changes in the original agreement of the parties. It reduced appellants' liability on the shipments already made by the sum of $243.36, based upon a credit allowance to appellants of the chickens which had died out of the two prior shipments totaling 38,000. It also provided for a ten per cent mortality allowance in all future shipments. Gordon conceded that the original agreement in April 1952 contained neither of these provisions. And most importantly, the July agreement completely changed the method of payment for the chickens shipped by the hatchery. They were ''to be paid for when the birds are sold on the basis of the number of chickens raised.'' These three material and substantial changes in appellants' original contract with appellee, assuming the correctness of Gordon's testimony, were of such a nature as to constitute a completely new and independent oral agreement. And since there was no part performance under it as required by the statute of frauds, Code Section 268, it was unenforceable.

In other words, the original agreement in April 1952 did not amount to an enforceable executory contract, because there was no agreement as to the future price of the chickens to be purchased. Gordon testified that the parties would ''set'' the price at the time a particular order was ''booked.'' And even if the original oral agreement were an enforceable one, the July oral agreement amounted to a completely new contract, in that it made three substantial and important changes in the original understanding. Since the July agreement was oral and there was no part performance under it, appellants are precluded by the statute from asserting their

counterclaim. ■■■ The statute was designed to serve the salutary purpose of requiring traders and others to make written summaries of their contracts of sale before they will be enforced. This case is a good illustration of the confusions and ambiguities which result from a failure to comply with the act, and of one reason why it was enacted.

Affirmed.

*Roberds, P. J.,* and *Hall, Lee* and *Holmes, JJ.,* concur.