586 So.2d 799 (1991)
J. Michael LEACH
v.
Bobby W. TINGLE and Wife, Lynda Gayle Tingle.
No. 90-CA-0486.
Supreme Court of Mississippi.
September 11, 1991.
Thomas L. Segrest, Graham & Segrest, Columbus, for appellant.
Gary Street Goodwin, Goodwin & Goodwin, Columbus, for appellees.
En Banc
BANKS, Justice, for the Court:

I.
This case presents the question whether a contract for the sale of real property, particularly, a "buy-back" provision thereof, is sufficiently specific that in law we may order specific performance. The *800 Chancery Court held in the affirmative and ordered the original Seller to repurchase the property. We find the language adequate to support such a judgment and affirm.

II.

A.
In 1987, Bobby Wayne Tingle accepted a position as circulation director with The Commercial Dispatch, a daily newspaper in Columbus, Mississippi. Prior to this time, Tingle and his wife, Lynda Gayle Tingle, had been living in Texas. In mid-October, 1987, The Commercial Dispatch's general manager put the Tingles in touch with Sue Whitten of Jourdan Realty Company to assist them in finding housing in the Columbus area. The Tingles told Whitten that they would prefer to rent and not purchase, one of their reasons being that they had not yet been able to sell their house back in Texas. In the course of discussions, Whitten told the Tingles of an area called Oakdale Park, which had been developed by J. Michael Leach. She explained that Leach customarily provided a "guaranteed buy-back" which might be consistent with the Tingles' needs.
On October 19, 1987, the Tingles entered into a contract with Leach whereby Leach would sell and the Tingles would buy a house and lot. Prepared on a Jourdan Real Estate printed form, the contract included language typed in blank spaces to localize it to the particular agreement between the Tingles and Leach. The contract called for a $66,000.00 sales price, $52,800.00 of which the Tingles were to borrow from First Federal Savings and Loan Association of Columbus. The Tingles were to pay $3,300.00 in cash to Leach at closing, and Leach was to finance the balance of the "down payment" by accepting the Tingles' note for $9,900.00 secured by a second deed of trust on the property.
At issue here is the language in a space marked "17. Special Provisions," which reads:
Seller [Leach] to give Purchaser [the Tingles] a guaranteed buy-back anytime after the first year and Purchaser will be given $3,300.00 with this buy-back by Seller.
This is the only mention of "buy-back" in the contract. All agree that the blanks in the printed form contract were filled in by Whitten, who was acting for Leach, but the contract was thereafter signed by the Tingles, by Leach, and by Charles W. Jourdan as "Broker."
The parties closed the sale on November 6, 1987. The customary execution and delivery of notes, deed, deeds of trust, took place. Leach, however, did not deliver the guaranteed "buy-back" agreement to the Tingles.[1] The Tingles moved into the house on November 7, 1987, and lived there uneventfully for a time.
In the Summer of 1989, the Tingles decided that they should sell the house, for reasons not explained. They tried on their own for several months, and the best offer they elicited was $62,000.00, some $4,000.00 shy of the November, 1987, selling price. On August 8, 1989, the Tingles approached Leach and demanded that he "buy back" the property. They cited the "buy-back" provision of the sales contract. Leach refused, noting that the Tingles' reasons were insufficient.[2]

*801 B.
On October 3, 1989, the Tingles commenced this civil action by filing their complaint in the Chancery Court of Lowndes County, Mississippi. They named Leach as defendant, charged that the contract bound him to repurchase the property, and demanded specific performance. Leach defended, inter alia, on grounds the sales contract was too vague and uncertain on the subject of "buy-back" to be susceptible to enforcement via specific performance.
After plenary trial, the Chancery Court found for the Tingles and ordered specific performance, the terms of which would be, the Tingles would
execute and deliver a good and valid warranty deed conveying subject property together with evidence of good title to the property, subject only to the liens set forth in the contract of sale.
The Court ordered Leach to pay the Tingles $3,300.00 at the time of closing and, implicitly, to treat as paid and satisfied the remaining balance of the $9,900.00 second mortgage "down payment" note the Tingles had given Leach.[3] The Court further directed Leach to assume the obligations of the loan transaction with First Federal Savings. "Whatever arrangements he [Leach] has to make with First Federal will be his concern." The Court finally provided that the Tingles would return the house to Leach "in the same condition as it was at the time of sale, except for normal wear and tear."
Leach now appeals to this Court.

III.
Our law of contracts affords persons in a relative state of freedom the option and opportunity, for perceived advantage, to bargain with each other and, if they wish, accept rights and responsibilities limiting their freedom of action. No doubt, by reason of the social and economic importance of contracts in our society, the law attaches conditions to this facility it affords our citizens. It tells us that there are formalities the parties must meet before their bargain may become legally enforceable. Putt v. City of Corinth, 579 So.2d 534, 537-38 (Miss. 1991); Williams v. Mason, 556 So.2d 1045, 1048 (Miss. 1990). Of importance today, one of those formalities is that the contract must be reasonably complete and its essential terms reasonably certain. Questions of the validity, enforceability and construction of contracts  of whether the parties have satisfied the law's formal requisites  are committed to the court as distinguished from the trier of facts. See, e.g., Keys v. Rehabilitation Centers, Inc., 574 So.2d 579, 583 (Miss. 1990); Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989).
No one denies the existence of the Contract of Sale and Purchase of Real Estate executed October 19, 1987, and no one denies that it was duly signed by the Tingles, as purchasers, and Leach, as seller. Our question is one of enforceability, and our focus is upon the "buy-back" language quoted above. The Tingles are correct to remind us that we do not read language such as this in isolation and out of context, but that we integrate it into the entire document and draw meaning from all that is relevant within the four corners of the contract. Texaco, Inc. v. Kennedy, 271 So.2d 450, 452 (Miss. 1973). We focus upon the objective fact, the language of the contract. Of course we seek intent, but the law has made clear that we may honor intent only insofar as it may be found in contract language which satisfies the criteria for legal validity. Osborne v. Bullins, 549 So.2d 1337, 1339 (Miss. 1989).
The Tingles remind us as well that ambiguous words and terms should be construed against the party who has drafted them; and we accept that, in a case where language of an otherwise enforceable contract is subject to more than one fair reading, we will give that language the reading most favorable to the non-drafting party. Stampley v. Gilbert, 332 So.2d 61, 63 (Miss. 1976). None of this is inconsistent *802 with our long acceptance that courts are charged to read contracts reasonably to give their terms and their conditions a reasonable construction and that the principle just noted should never be utilized to give words a meaning they will not bear. See Hicks v. Bridges, 580 So.2d 743, 746 (Miss. 1991); Hutton v. Hutton, 239 Miss. 217, 229-30, 119 So.2d 369, 374 (1960).
Most specific performance cases are brought by would-be buyers charging sellers' breach. Our law seems settled that a would-be seller such as the Tingles may have a specific performance remedy as well, provided they report the remedy's requisites. Osborne v. Bullins, 549 So.2d at 1340.
Before a court may order specific performance of a contract, it must find the contract reasonably complete and reasonably definite on material points. Duke v. Whatley, 580 So.2d 1267, 1272-74 (Miss. 1991). A contract is said to enjoy the level of specificity predicate to enforceability:
if it contains matter which will enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence.
Duke v. Whatley, 580 So.2d at 1274, quoting McGee v. Clark, 343 So.2d 486, 489 (Miss. 1977) (quoting Jones v. McGahey, 187 So.2d 579, 584 (Miss. 1966). See also, Hicks v. Bridges, supra; and Busching v. Griffin, 542 So.2d at 863. If the contract does not pass this test of specificity, the court should find it unenforceable and deny specific performance. Duke v. Whatley, 580 So.2d at 1274-75; Sta-Home Health Agency, Inc. v. Umphers, 562 So.2d 1258, 1262 (Miss. 1990); Quick and Grice v. Ashley, 227 Miss. 273, 86 So.2d 40 (1956); Izzard v. Jackson Credit Corporation, 188 Miss. 447, 195 So. 331 (1940).
We are concerned today with a particular type of contract. The contract of sale of October 19, 1987, by its terms contemplated a consummation via another exchange of documents some weeks in the future and was in this sense a contract to make a contract. But this does not preclude enforceability. The fact that the writing sued upon by its terms contemplates further documents and a closing in no way renders the writing sued upon unenforceable according to its terms. Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989); Vicksburg Waterworks Co. v. J.M. Guffy Petroleum Co., 86 Miss. 60, 66, 38 So. 302, 304 (1905). These principles apply to a contract to make a contract the same as they apply to any other contract or agreement. Etheridge v. Ramzy, 276 So.2d 451, 454-56 (Miss. 1973).
We have recognized such contracts perform dual and arguably separate functions, "precatory and obligatory," Keys v. Rehabilitation Centers, Inc., 574 So.2d at 583, the same as is a contract to devise or bequeath property. Williams v. Mason, 556 So.2d 1045, 1049 (Miss. 1990); Trotter v. Trotter, 490 So.2d 827, 830 (Miss. 1986). It is obligatory in two specific senses. The contract is the measure of the closing documents. A contract of sale gives parties the right to complain if another tenders a closing document not in compliance with the contract. Keys v. Rehabilitation Centers, Inc., 574 So.2d at 583; see also, Putt v. City of Corinth, supra. Of course, the contract contemplates closing documents and, without doubt, those documents will supplant and subsume the contract in many respects. Keys v. Rehabilitation Centers, Inc., 574 So.2d at 583. Still, obligations of the contract of sale which at closing are neither supplanted nor fulfilled remain viable and enforceable. Keys v. Rehabilitation Centers, Inc., 574 So.2d at 583; Knight v. McCain, 531 So.2d 590, 594-95 (Miss. 1988).
In ascertaining whether a contract is sufficiently definite to be enforceable, we have accepted that the court may employ a standard of reasonableness. The court should supply incidental terms, consistent with the structure of the agreement but, conversely, essential or core terms may not be judicially added. See, e.g., Duke v. Whatley, supra; Putt v. City of Corinth, supra; Smith v. Mavar, 198 Miss. 170, 175, 21 So.2d 810, 811 (1945); Pugh v. Gressett, 136 Miss. 661, 691-92, *803 101 So. 691, 698 (1924). For example, where no time for performance is given the court may decree a reasonable time. Hicks v. Bridges, supra; Fortune Furniture Manufacturing, Inc. v. Pate's Electronic Company, 356 So.2d 1176 (Miss. 1978). On the other hand, price is an essential term. It must be stated with specificity. Where it is not provided, the contract fails. Duke v. Whatley, supra; Busching v. Griffin, 542 So.2d at 864. This does not mean that the price must be set out simply. Where, from the terms of the contract, one familiar with elementary principles of mathematical reasoning may deduce with certainty the sales price, the contract will not fail. Gordon v. Fechtel, 220 Miss. 722, 729-30, 71 So.2d 769, 771 (1954). On the other hand, where the language employed necessarily requires a substantial measure of speculation and conjecture in ascertaining price, the contract fails. Gordon v. Fechtel, 220 Miss. at 729-30, 71 So.2d at 771.

IV.
We apply these principles to the case at bar, and when we do so, we search the language of the contract for whether there be sufficient specificity that an enforceable "buy-back" agreement was there created. If anything is clear, it is that the language in the contract contemplates that, at closing, Leach will give the Tingles an agreement guaranteeing that he will buy back the property. The language of paragraph 17 of the Contract of Sale is not the "buy-back" agreement itself, and, in a very real sense, our question is whether that language is sufficiently certain so that it might be enforceable in an action for a specific performance to require Leach to give a "buy-back" agreement. In such an action, the parties would be bound by the terms of the Contract of Sale for the essentials of the agreement. Hence, we presume for present purposes that, at closing, Leach did give a "buy-back" agreement consistent with paragraph 17. We do not have here any inference that the Tingles waived any rights they may have had under paragraph 17. Contrast, Keys v. Rehabilitation Centers, Inc., 574 So.2d at 583.
The Chancery Court found that the contract provided an original purchase price of $66,000.00 and provided terms for financing and a down payment, specifically including a cash payment by the Tingles to Leach of $3,300.00, and reasoned that
One could logically conclude that the repurchase would be that the buyers [the Tingles] would receive back their down-payment of $3,300.00 and seller [Leach] would take over or assume the loans set forth in the contract of sale. As the seller financed the second deed of trust, that would be no problem. As the First Federal Deed of Trust was for a set amount, set interest rate, it could easily be contemplated that the seller would assume it.
On appeal, Leach makes much of an ambiguity in timing. The sentence says he will give the Tingles "a guaranteed buy-back anytime after the first year." Leach says this is hopelessly vague and indefinite and that no one can tell whether this means that the "buy-back" agreement will be given "anytime after the first year" or whether the Tingles' right to have Leach buy the property back becomes enforceable "anytime after the first year." We agree that the language admits of both constructions, but on either construction, the Tingles survive, assuming the agreement is otherwise enforceable. The Tingles sought to enforce the "buy-back" beginning August 14, 1989, some twenty-one months and a week after closing. If the "buy-back" agreement had been given within a reasonable time after the first year, the Tingles' demand would be timely. On the other hand, if the Tingles' rights in the "buy-back" ripened only after the first year, again their action would be timely.
More important is the question of price. The only thing certain here is that the agreement calls for Leach to deliver to the Tingles $3,300.00 cash at the time of "buy-back." The question is whether from this we may infer with certainty the gross sales price. The Chancery Court held that we may, reasoning that, by looking at the rest of the contract, one could find that $3,300.00 was the amount of cash the Tingles *804 paid to Leach at closing in November of 1987, and that, if the "buy-back" called for Leach to return that amount of cash, one could assume an agreement that thereafter the Tingles walked away clean.
The Chancery Court reasoned that, from the $3,300.00 cash payment, "one could logically conclude that the repurchase would be that ... seller would take over or assume the loans set forth in the contract of sale." Indeed, the only reasonable conclusion that can be drawn is that the repurchase price is $3300 more than the remaining balance on the notes. Any other construction of the term would require that the Tingles receive more or less than the $3300.
It is argued that it would be just as logical and fair that the the agreement contemplates, for example, that the property be appraised and that Leach be required to repurchase at the appraised value. While that method may be just as fair, it is not a logical conclusion to be drawn when one factors in the specific provision for returning the $3300. If the appraised value escalates, the Tingles would be entitled to more than $3300. If the property declines in value the Tingles would be entitled to receive less. It is illogical that Leach would be required to pay the Tingles $3300, if the Tingles were indebted to him for a portion of, all of or more than that amount by virtue of a decrease in property value.
The fact that the language in Item 17 does not indicate that $3300 is all that the Tingles are to receive or that they are to receive it in cash need not detain us. Assuming no cash requirement does not affect the compelling nature of the conclusion reached by the trial court. If we are to assume that the $3300 may be paid with some indicia of indebtedness and at the same time argue that this amount may not completely state the resulting relationship between the parties, then why is the amount specified. Are we to assume one note for $3300 plus another for $100 or $1500 or some other amount? Is it logical to assume a note to the Tingles for $3300 and a note to Leach for $4000 or some other amount based on appraised value?
It is the specification of amount which is important, not the form of payment. Busching v. Griffin, 542 So.2d 860, 864 (Miss. 1989). There is simply no logical explanation for specifying a return of the $3300, if after that was done there was to remain some obligation owing from one party to the other. The only way for the Tingles to be entitled to $3300 is if Leach assumed and forgave them for all other indebtedness. If we conclude that the specification of the amount fixes the price, however, it follows, in the absence of an indication to the contrary that this amount would be paid in cash. Busching v. Griffin (I), 465 So.2d 1037, 1042 (Miss. 1985).
This is not a case in which purchase price was left for future negotiation as was the case in Duke v. Whatley, supra, where the lessee was offered "the first chance" to buy, if the seller decided to sell without any statement whatever of price or a method for its determination. Here there is evidence of the intent of the parties regarding price. It is not for us to figure out what a more explicit contract could have provided. We need only determine whether enough is written to allow a reasonable fact finder to deduce a price based on a reasonable non-conjectural construction of what is there. It is interesting, though not controlling, that, as to price, the alleged written agreement had precisely the price provision found by the chancellor to be only one reasonably consistent with the language used. It is a construction which is consistent with any "money-back guarantee". The chancellor reasoned from the evidence before him and arrived at the intent of parties. He did not speculate or engage in conjecture. We affirm.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
PRATHER, J., not participating.
NOTES
[1] At trial, Leach vigorously argued to the contrary. Leach produced a document entitled "Agreement to Repurchase" covering this specific property and naming the Tingles. The document is dated November 6, 1987, the closing date. It is apparently professionally prepared and regularly used by Leach in his development of the Oakdale Park. Sue Whitten testified that she handed the agreement to the Tingles. The Tingles, however, denied that they ever received it, and the Chancery Court found as a fact that they had not. See Bell v. Parker, 563 So.2d 594, 597 (Miss. 1990); Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss. 1987); Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss. 1983). Leach does not challenge this finding on appeal, and we proceed on the assumption the Agreement to Repurchase was, in fact, never given to the Tingles.
[2] Leach relied on the Agreement to Repurchase which the Chancery Court found that the Tingles never received. That agreement provided that Leach would repurchase only if Tingle had been "transferred by present employer to another location other than Lowndes County, Mississippi." Tingle was not being transferred.
[3] The testimony revealed that Leach had an agreement with Jourdan that the $3,300, which also represented the amount of the real estate commission, would be refunded to Leach by Jourdan in the event that the buy back provision was enforced.