**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 7, 2012

No. 11-60432

Lyle W. Cayce
Clerk

J.A.M. PROMOTIONS, INC.,

Plaintiff-Appellant

v.

TUNICA COUNTY ARENA & EXPOSITION CENTER, INC.; W.A. PECK
BOUCHILLON; and TUNICA COUNTY, MISSISSIPPI,

Defendants-Appellees

Appeal from the United States District Court for the
Northern District of Mississippi
USDC No. 2:09-cv-00016

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:[*]

This appeal presents a contract dispute between Plaintiff-Appellant J.A.M. Promotions, Inc. ("JAM") and Defendants-Appellees Tunica County Arena and Exposition Center, Inc. ("Arena"), W.A. "Peck" Bouchillon, and Tunica County, Mississippi. The district court granted summary judgment for the Defendants on all claims, finding that, starting in 2008, there was no contract between the parties, but merely an agreement to enter a future contract. JAM now appeals.

---

[*] Pursuant to FIFTH CIRCUIT RULE 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in FIFTH CIRCUIT RULE 47.5.4.

No. 11-60432

Because we agree that JAM has failed to show the existence of a binding contract, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

JAM is a corporation that promotes go-kart races. Its owner/operator and sole shareholder is Lanier James. Currently, JAM promotes one go-kart race per year, the National Go-Kart Racing Championship.

In 2000, the Arena contacted JAM about having the National Championship race in Tunica. JAM agreed, and it held the race at the Arena for the first time in 2001. The race grew from 800 entries in 2001 to 1200 in 2007. For those six years, the race was held on Thanksgiving weekend, and it became the largest indoor go-kart race in the world.

JAM and the Arena had a contract each year the race was held. According to JAM, the parties had always contemplated that the contract would be renewed year-to-year, as reflected in a deposit clause contained in the 2007 contract. Roger Newman, the Arena director from April 2000 to February 2006, drafted the deposit clause, which was approved by the Arena's attorney. Each year, when JAM and the Arena settled after the race, JAM would leave a $2,000 deposit to secure the race for the following year. JAM states that once it had left its deposit, it was the only party who could cancel the event.

Newman was responsible for soliciting JAM to bring the go-kart race to Tunica County. Bouchillon, who had worked under Newman, became the Arena director in 2006, when Newman left. JAM alleges that "[t]he first year Bouchillon was in charge, Lanier James had numerous problems with the race because of Bouchillon's negligence and/or deliberate indifference." According to JAM, the Arena floor was packed with the wrong kind of dirt for a track, the

2

No. 11-60432

facility ran out of toilet paper in the bathrooms, the plumbing stopped up, and Bouchillon could not be located to deal with these problems. 2006 was the best attendance year for the event yet, however, and JAM still made a profit.[2]

JAM alleges that there were also problems with the National Championship race in 2007, again due to Bouchillon's negligence. This time, JAM lost money on the race. JAM claims that if it weren't for the problems encountered with the race in 2006 when Bouchillon was first director of the Arena, JAM would have turned a profit in 2007.

On January 15, 2008, Bouchillon wrote a letter to James canceling the go-kart race for 2008 and returning the $2,000 deposit James had left with the Arena. JAM alleges that Bouchillon cancelled the race because he had to work hard during the event, and because James would not give him a kickback. JAM also states that the Arena's given reason for cancelling the go-kart race, that it caused environmental problems, was pretextual because the Arena tried to attract other motorized events in 2008.

JAM sued the Arena and the County for breach of contract, tortious breach of contract, and lack of good faith and fair dealing with a contract. JAM also sued Bouchillon in his individual capacity for malicious interference with a contract. On June 6, 2011, the district court granted all of the Defendants' motions for summary judgment. The court found that there was no contract between JAM and the Arena for 2008 or any year thereafter. Because a valid contract did not exist, JAM could not have claims for lack of good faith and fair

---

[2] JAM also alleges that after the 2006 race, Bouchillon "tried to shake James down for a kickback while falsely accusing James of a crack in the floor." While we assume this incident is included in support of JAM's claim against Bouchillon for malicious interference with a contract, no further reference to it is made in JAM's brief.

No. 11-60432

dealing or malicious interference with that contract. The district court also held that JAM had failed to show a genuine issue of material fact in regards to its conversion claim, because the only discussion of that claim in its briefs spanned two pages, and "[t]here is no law cited, nor is there evidence cited other than conclusory statements."[3]

## II. STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo* and applies the same standard as the district court. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010). Under that standard, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). When reviewing a motion for summary judgment, the Court construes all the evidence and reasonable inferences in the light most favorable to the nonmoving party. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 234 (5th Cir. 2010) (quoting *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009)).

---

[3] Similarly, beyond stating in its brief that the "Arena converted property to its own use by continuing to utilize pictures of Plaintiff's go-kart event in order to promote the Arena," JAM makes no arguments regarding its conversion claim on appeal, nor does it cite any caselaw. Therefore, JAM has waived its conversion claim. *See Batiste v. Theriot*, 2012 WL 89414, at *8 (5th Cir. Jan. 10, 2012) (per curiam) (stating that plaintiffs "present no evidence or even more than a passing reference to these arguments in their briefs and, as such, those arguments are waived").

4

No. 11-60432

## III. ANALYSIS

In this diversity case, the district court properly applied Mississippi law. *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F.3d 526, 529 (5th Cir. 1998). Under Mississippi law, questions of contract construction are questions of law, rather than questions of fact committed to the factfinder. *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So.2d 107, 110 (Miss. 2005). In order to be enforceable, a contract "must be reasonably complete and its essential terms reasonably certain." *Leach v. Tingle*, 586 So.2d 799, 801 (Miss. 1991). Courts use a reasonableness standard in deciding if a contract is definite enough to be enforced. *Id.* at 802. Only when agreements are "'vague, indefinite and uncertain' . . . in which the promises and performances to be rendered by each party are not reasonably certain, are [they] not enforceable as contracts." *Massengill v. Guardian Mgmt. Co.*, 19 F.3d 196, 202 (5th Cir. 1994) (quoting *First Money, Inc. v. Frisby*, 369 So.2d 746, 751 (Miss. 1979)).

Mississippi courts have a "three-tiered approach to contract interpretation." *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So.2d 748, 752 (Miss. 2003). First, they look to the words in the contract to determine intent or purpose. *Id.*; *see also Facilities Inc.* 908 So.2d at 111. They do this by looking to the "four corners" of the contract, and reading it "as a whole, so as to give effect to all of its clauses." *Royer*, 857 So.2d at 752. A court should look to the parties' words, not to their unspoken intent, and the court cannot "infer an intent contrary to that emanating from the text at issue." *Id.*; *see also One South, Inc. v. Hollowell*, 963 So.2d 1156, 1162 (Miss. 2007) ("In order to determine and record the intent of the contracting parties, we focus upon the objective language of the contract."). Only if the contract is ambiguous or

unclear should the court try to harmonize its provisions with the parties' apparent intent, and go beyond the text to do so. *Royer*, 857 So.2d at 752-53. "[T]he mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law." *Id*. at 753 (quoting *Turner v. Terry*, 799 So.2d 25, 32 (Miss. 2001)).

Second, if the court cannot determine the parties' intent from the text, it "should apply the discretionary 'canons' of contract construction." *Royer*, 857 So.2d at 753 (citation omitted). If the language of the contract is susceptible to more than one reasonable reading, "the reading applied will be the one most favorable to the non-drafting party." *Id*. (citation omitted). Third, if the contract is still unclear as to the parties' intent, the court may consider extrinsic or parol evidence. *Id*.; *see also Facilities, Inc*., 908 So.2d at 116. "It is only when the review of a contract reaches this point that prior negotiation, agreements and conversations might be considered in determining the parties' intentions in the construction of the contract." *Royer*, 857 So.2d at 753.

In this case, the district court held that the deposit clause in the 2007 contract between JAM and the Arena "does not create a perpetual reservation for the plaintiff's event." Instead, the court found that "the deposit clause is an agreement to enter into a future contract and such agreements are unenforceable as a matter of Mississippi law unless all material and essential terms have been agreed upon." Because the specifics of the dates and times of future events, as well as the price, were not included in the deposit clause, the parties had not agreed on all of those essential and material terms. Therefore, "there was no contract to breach."

No. 11-60432

On appeal, JAM again argues that the deposit clause in its 2007 contract with the Arena was a contract to make a contract, and because it contained all the essential and material terms, it was unambiguous and binding. JAM argues that the National Go-Kart Racing Championship always occurred over Thanksgiving weekend, and the rental fee had been the same for several years. In the alternative, JAM argues that the contract was ambiguous, and therefore must be applied against the drafters, Tunica and the Arena. According to JAM, extrinsic evidence shows that the parties intended for the $2,000 deposit to create a binding contract for the following year's event. JAM also avers that the contract's plain wording and the parties' course of dealings show that they intended for the contract to continue from year to year. The Defendants respond that the district court correctly found that the 2007 contract was unambiguous, and that JAM's deposit was a non-binding agreement to enter into a future contract, because it did not contain the essential terms of time and price.

The deposit clause in the 2007 Facility Use Agreement between JAM and the Arena reads as follows:

> **ADVANCE PAYMENT/DEPOSIT POLICY**
>
> User agrees to pay the following advance non-refundable payment/deposit schedule:
>
> USER may leave the deposit from year to year to secure future dates for which a contract will be issued for future dates/events at a later time. The deposit will secure a date or dates TBD but not necessarily the same dates covered under this agreement. A variety of reasons could result in the need to change the date(s) of the event. ARENA will hold those dates agreed upon at the end of the current contract event but if at any time during the period prior to a new contract being issued

> and signed USER cancels the event for any reason the deposit will be forfeited in accordance to the same terms of the contract without penalty to either party.

According to JAM, the fact that the clause employs the phrase "USER may leave the deposit from year to year to secure future dates," as well as the word "will," means that: the Arena did not have the choice to cancel; only the user, JAM, could cancel; and as long as JAM chose to leave a deposit, it would secure a date for the go-kart race for the following year. The district court found that it was not reasonable to interpret the deposit clause to require the Arena to perpetually host the go-kart race. We agree. Mississippi does not favor perpetual leases. Indeed, Mississippi law does not allow a perpetual lease unless the language employed in the contract clearly and unambiguously indicates that it was the intent and purpose of the parties to do so. *Stampley v. Gilbert*, 332 So.2d 61, 63 (Miss. 1976). Such clear and unequivocal language of intent and purpose is not present here.

Furthermore, as the district court noted, the deposit clause does not contain all of the material and essential terms necessary to create an enforceable agreement between JAM and the Arena. Mississippi courts have found that "price is an essential [contract] term." *Leach*, 586 So.2d at 803. "It must be stated with specificity"; if not, "the contract fails." *Id.* When material terms such as price are missing, then an agreement is not a contract, but "merely a memorandum of intent." *Duke v. Whatley*, 580 So.2d 1267, 1273 (Miss. 1991)*; see also Betty Lee Shoes, Inc. v. Karl's Shoe Stores, Ltd.*, 293 F.2d 429, 432 (5th Cir. 1961) ("If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract to make a contract' is not a contract at all."

No. 11-60432

(quoting 1 Corbin, Contracts, § 29, pp. 67-71)).  JAM argues that it is sufficient that the contract contained a minimum rental fee,[4] but a base rental fee still leaves open the material term of final price.  Furthermore, it is clear from the 2007 contract that the parties negotiated specific prices for specific dates and activities associated with the race, and then finalized the contract.  There is no way for a court to determine whether in 2008 the parties would agree to the same number of days and services for the same prices.  *See Duke*, 580 So.2d at 1274 ("[W]ithout knowledge of the parties['] intent of an essential term, this Court, and any court, is unable to determine what performance should be required.").

Furthermore, the deposit clause itself states that a "deposit will secure a date or dates TBD," and that a "contract will be issued for future dates/events at a later time."  The clause clearly contemplates that the parties would enter into a separate agreement later, and that they have not yet agreed to the dates for the 2008 event (or any event thereafter).  *See J. Russell Flowers, Inc. v. Itel Corp.*, 495 F. Supp. 88, 91 (N.D. Miss. 1980) ("The letter addressed itself to financing only, and it openly contemplated further negotiations as to a 'more definitive document.'  It cannot be said, on the basis of this letter, that all material provisions have been agreed upon, and that there is nothing left for future settlement.").  For an event held once per year, the dates that it will take place are clearly a material term of the contract.  JAM states that the race was

---

[4] It should be noted that JAM seems to confuse whether the deposit clause or the entire 2007 contract creates a contract for 2008 and the years following.  If, as JAM argues, "the deposit clause at issue was a valid and binding contract to make a contract," then the deposit clause should contain all of the material terms, such as price.  However, the minimum rental fee, and the breakdown of that fee, is found in a different section of the 2007 contract.

always held Thanksgiving weekend, but the document does not contain that information, and generally a court should look no further than the document itself. *Id.*

The 2007 contract does not contain enough information in the deposit clause, or anywhere else, for a court to determine the parties' intentions as to any go-kart race to be held in 2008. Consequently, the district court correctly held that the deposit clause does not constitute a binding contract between JAM and the Arena, but merely an agreement to enter into a future contract.

JAM argues in the alternative that the contract is ambiguous, and the Court should apply the canons of contract construction. *See Royer*, 857 So.2d at 753. However, as detailed *supra*, the deposit clause is not an ambiguous contract – it is simply not a contract at all. Thus, JAM's arguments about construing the contract against its drafter, the Arena, and employing parol evidence to elucidate the parties' intent, are non-starters. Those canons would be useful to the Court only if there were a contract to which they could be applied.

Finally, JAM argues that there are issues of material fact as to whether there was a contract between it and the Arena for the years after 2008. According to JAM, "the course and proceedings of the parties created a contract for future events." *Id.*[5] JAM references *Scott v. Magnolia Lady*, Inc., 843 So.2d 94 (Miss. App. 2003) for the premise that when one party relies on a course of business dealings to its detriment, "courts have found the existence of a valid contract." *Id.* at 96. However, in *Scott*, the court also held that "[t]o avoid such

---

[5] JAM cites the Mississippi Uniform Commercial Code in support of this course-of-dealing argument, but the Uniform Commercial Code only "applies to transactions in goods." Miss. Code Ann. § 75-2-102.

No. 11-60432

a claim, the party seeking to alter the established course of dealings must clearly and timely indicate the intent to alter the established pattern of conduct." *Id*. Here, Bouchillon told James in January of 2008 that the Arena would not host the go-kart race that year. Since, according to JAM, the race was usually held on Thanksgiving weekend, Bouchillon gave James approximately 11 months' notice that he was altering their "established pattern of conduct." *Id*. For a yearly event, 11 months is surely "sufficient to put [James] on notice that [the Arena] declined to do business under the old practices." *Id*. Therefore, even if JAM had been able to show that it relied on a course of business dealing to its detriment, the Arena, through Bouchillon, timely indicated its intent to alter the pattern of conduct. Accordingly, the Arena avoided the claim of a valid contract binding it after 2008.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.