DICKINSON, Presiding Justice,
for the Court:
¶ 1. For four years, Precision Welding, Inc., a subcontractor, provided construction services to Denbury Onshore, LLC, under an oral agreement. Denbury— claiming its contract with Precision was terminable at will — terminated the relationship in 2006. Precision filed suit, claiming Denbury had breached its obligation to keep Denbury on the job until the completion of the project. A jury found for Precision and awarded it $1,500,000 in damages. But because the oral contract between Denbury and Precision was for a particular hourly rate for work performed — and not for any particular or definite time period — we hold the contract was terminable at will, and we reverse the jury verdict. We do, however, remand for a new trial on the issue of whether, under the circumstances, Den-bury provided Precision reasonable notice of the termination and, if not, the damages it proximately caused.
FACTS AND PROCEDURAL HISTORY

The Relationship

¶ 2. Denbury Onshore is an oil and gas company that recovers tertiary oil across the State of Mississippi. Recovering tertiary oil requires large amounts of carbon dioxide gas, which Denbury recovers at its numerous dehydration plants.
¶ 3. In 2001, Denbury purchased a tract of land in central Mississippi called the “Jackson Dome.” This tract contained a large, underground reserve of carbon dioxide, and Denbury needed a welding company to help build dehydration plants necessary to recover the gas. Denbury hired Precision Welding, and from 2002 until 2006, Precision worked almost exclusively for Denbury.
¶4. Precision billed Denbury by the hour and worked at multiple plant locations. As soon as Precision finished a project, it moved to the next. Both Den-bury and Precision agree the arrangement was never in writing, and they never contemplated an end date for Precision’s work. Precision’s president, Mike Dickerson, stated that “there was never any discussion between [Precision] and Denbury that [Precision’s] work for Denbury would end in the near future.”

The Barksdale Plant

¶ 5. In 2005, Denbury — for the first time — began soliciting bids for its projects. The first project requiring a bid was a dehydration plant at the Jackson Dome, called the Barksdale Plant. This project actually was two separate plants, named Barksdale I and Barksdale II. The bid itself was a time-and-materials bid, which called for construction labor and required bidders to submit hourly rates for labor and equipment. Precision submitted a bid and Denbury accepted it and hired Precision, which began working on Barksdale I in 2006.

Termination

¶ 6. During a 2006 audit, Denbury discovered that, over the previous two years, Precision had given Wal-Mart gift cards to Denbury employees for Christmas. It is undisputed that the Denbury employees violated their company’s ethics policy by accepting the gift cards. Dickerson refused to provide Denbury’s auditors the *452 names of the employees who had accepted the cards. When Denbury’s auditor asked Dickerson a second time, he said he could not remember who had accepted the cards. Finally, in July 2006, Dickerson again refused to give Denbury the names, so Den-bury terminated Precision Welding. At the time of the termination, construction of Barksdale I was almost half finished, and Barksdale II had not started.

The lawsuit

¶ 7. In March 2007, Precision sued Den-bury for (1) tortious interference with a business relationship; (2) breach of the duty of good faith and fair dealing; (3) tortious interference with a contract; (4) slander and defamation; (5) conspiracy; and (6) detrimental reliance. But when the ease went to trial, Precision presented only two claims to the jury: breach of contract and breach of the duty of good faith and fair dealing.
¶ 8. Prior to trial, Denbury moved for summary judgment, claiming its contract was terminable at will. Although the trial judge denied the summary judgment, Den-bury raised the same issue, both at the close of Precision’s case-in-chief, and at the close of the evidence. The trial judge denied Denbury’s motions and submitted the matter to the jury on whether the contract was terminable at will.
¶ 9. After deliberating, the jury returned a $1.5 million verdict for Precision. Den-bury moved for judgment notwithstanding the verdict (JNOV) or for a new trial, which the circuit judge denied. Denbury now appeals the denial of that motion, raising the following issues: (I) whether an oral or implied contract could have been found to exist; (2) whether the relationship between Precision and Denbury was of indefinite duration, subject to termination at will by either party; (3) whether the evidence was sufficient to prove that unreasonable notice was given before termination of the contract; (4) whether there was sufficient evidence to prove lost profits; and (5) whether the evidence was sufficient to prove breach of the duty of good faith and fair dealing.
ANALYSIS
¶ 10. ■ We review de novo a trial judge’s denial of JNOV.[1] A “motion for JNOV is a challenge to the legal sufficiency of the evidence, and this Court will affirm the denial of the JNOV only where substantial evidence supports the verdict.” [2] We define “substantial evidential” as evidence “of such quality and weight that reasonable fair-minded jurors in the exercise of impartial judgment might have reached different conclusions.”[3] We review this evidence in the light most favorable to the verdict.[4]
1. A valid oral contract existed — for hourly rates.
¶ 11. Denbury argues that the trial court erred by denying its motions for directed verdict, summary judgment, and JNOV. Our standards of review for a denial of summary judgment, directed verdict, and JNOV are the same and are listed above.[5]
*453 ¶ 12. "While it is undisputed that Den-bury and Precision had an oral contract regarding the hourly rate to be paid by Denbury for Precision’s work, Denbury claims that it never agreed to any particular duration or scope of the work, or— other than the hourly rate — to any particular price for the job. Denbury cites Leach v. Tingle[6] and Duke v. Whatley[7] for the propositions that, to be enforceable, contracts must specifically state three essential terms: scope, time for inception and completion of work, and price; and contracts that do not include these essential terms are mere “agreement[s] to agree” and therefore unenforceable.[8]
¶ 13. In Duke, for example, Lillian Whatley leased a tract of land to Jimmy and Peggy Duke and purported to grant them a right of first refusal in the lease.[9] Regardless, "Whatley sold the property to her stepson, and the Dukes sued for specific performance.[10] At issue was whether — where the parties agreed to determine price at a later time — the contract was enforceable.[11] This Court noted that rights of first refusal are enforceable only where price is specifically agreed to.[12] And as for option contracts, the parties must specifically agree to both price and the period of time in which the promisee may exercise the option.[13] Unfortunately for the Dukes, their lease did not specify price.[14]
¶ 14. This Court held that, “[w]ithout some written evidence of purchase price or a method of determining a purchase price ... the agreement would have to be regarded as merely a memorandum of intent.”[15] Further, this Court held that “[wjhile courts may supply reasonable terms which the parties omitted in the contracting process, such as a time for performance, essential terms such as price cannot be left open ended questions in contracts which anticipate some future agreement.”[16] Duke, as well as Leach, stands for the rule that contracts to enter into future contracts must contain “all ... material and essential terms and leave none to be agreed upon as the result of future negotiations.”[17] That is because mere agreements to agree are unenforceable.[18]
¶ 15. The strict requirements in Leach and Duke do not always apply. For example, when the parties to a contract agree to the scope of the work performed, but do not specify the time or duration for performance, the Court may infer a reasonable time.[19] But where parties enter a contract with no specific scope of work, the contract is terminable at will by either party.[20] And while this Court requires *454 option contracts and rights of first refusal to specifically state price, this Court will— in other instances — enforce a contract if “one familiar with elementary principles of mathematical reasoning may deduce” the price with certainty.[21]
¶ 16. Here, Precision agreed to provide hourly labor at hourly rates. But hourly rates — without more — do not establish the entire contract price. Denbury correctly likens its rate sheets specifying Denbury’s hourly rates to knowing “the cost per gallon of gasoline” without knowing how much will be purchased.
¶ 17. Regardless, a valid contract existed here. The relationship between Denbury and Precision was for hourly construction labor. And Denbury hired Precision by accepting the rate sheet Precision supplied. That rate sheet provided specific hourly rates for manual labor, hourly rates for use of certain equipment, and per-day and per-month charges for other specific types of equipment. The scope of the bid went no further than an agreement for Precision to be paid its hourly rate for each hour of work performed, according to the rate sheet. So, while the" price for each hour of work performed was known and agreed to, the parties had no agreement as to any particular number of hours of work. Just as Denbury was free to increase the number of work hours given to Precision, it was free to bring in other welding contractors to do part of the work; and it was free to terminate the relationship [22] so long as it paid Precision for each hour worked, as agreed. Under this agreement, scope and price are sufficiently definite, and a valid contract existed.
2. The oral contract was terminable at will.
¶ 18. Denbury next argues that the trial judge erroneously denied Denbury’s motions for directed verdict, summary judgment, and JNOV because the contract was indefinite in time, and therefore terminable at will by either party upon reasonable notice and that the issue of whether the contract was terminable at will never should have gone to the jury.
¶ 19. In American Chocolates, Inc. v. Mascot Pecan Co., Inc., we held that “contracts for an indefinite period are terminable at will by either party upon giving reasonable notice to the other party.”[23] To determine the terms of a contract — so as to determine definiteness — this Court *455 applies an objective standard:[24] It is fundamental that contract “law has nothing to do with the actual state of the parties’ minds. In contract, as elsewhere, it must go by externals, and judge parties by their conduct.”[25] Accordingly, we look to the parties’ conduct to determine whether the contract was indefinite in time.
¶ 20. The relationship between Den-bury and Precision began in 2002 and ended in 2006. During that time, Precision provided construction services at multiple plant locations across the state, and the parties never discussed any end date or any particular amount of work for Precision. Precision’s own counsel—during closing argument at trial—demonstrated the indefiniteness of the contract by stating:
So while I suggest to you, ladies and gentlemen, that the proof is sufficient that they would have finished Barksdale 2, Gluckstadt 2, and the Natchez Trace plant, and they would have continued with all of the other work they had in south Mississippi, they, at least, were going to finish Barksdale 1.
¶ 21. Precision’s Barksdale 1 bid was a “time and materials” bid, which was “a nonexclusive contract” that did not “require a definitive amount of work to be performed.”[26] Legal treatises on the subject agree that a
time and materials contract is a form of open-ended cost reimbursement contract under which the contractor is paid merely for furnishing construction resources of labor and materials without significant performance risk.... [27]
¶ 22. A “time and materials” bid is distinct from a “hard-money” bid (also known as a “turnkey” or “fixed-price” bid). A “hard-money” bid “is an exclusive contract whereby the parties negotiate a total sum for labor, equipment, materials, and profit.”[28] Further, a hard-money bid is a contract to build an entire project—as a whole or as a unit—for a fixed amount. Because the bid here was a “time and materials” bid, the agreement was for hourly labor—not a definite agreement to build the entire plant.
¶ 23. Because Denbury orally contracted for Precision’s labor—charged at hourly rates with no specific end date, no particular number of hours, and no set scope of work committed to Precision—we hold that the contract was indefinite in duration. This Court has held that a contract “without limit as to duration, will not be construed as a perpetual contract but rather as terminable at the pleasure of either party, or that the things to be done shall be performed within a reasonable time.”[29]
¶ 24. At oral argument, we asked Precision’s counsel to point us to evidence in the record showing that Denbury was obligated to allow Precision to complete any particular amount of work, thereby making the contract’s time period definite. Precision cited subjective aspirations, hopes, and beliefs that it would be allowed to *456 finish the Barksdale plant and continue providing labor for Denbury in the future. For example, Dickerson stated in an affidavit:
I anticipated that [Precision] would complete the entire dehydration (C02) plant at Barksdale 1 .... [and][i]t was my understanding and belief that [Precision] would continue to work for Den-bury Onshore, LLC for as long as Den-bury Onshore, LLC continued to expand its operations in Mississippi and Louisiana.[30]
Precision’s counsel also pointed to the bid itself, which was nothing more than a bid for hourly “Construction Labor” — not a “fixed bid.”
¶ 25. Precision Welding may have anticipated that it was going to finish the Barksdale plant. It may have also believed that Denbury was obligated to let it finish Barksdale 1 and any future plants Denbury would require. But this Court follows the fundamental principle of contract law[31] that contractual terms “must be interpreted by objective, not subjective standards....”[32]
¶ 26. Precision Welding cited much evidence of its subjective beliefs, thoughts, and aspirations, but no objective evidence that it committed — and was obligated to perform — any particular amount of work, or that Denbury was obligated contractually to provide Precision any particular amount of work. Therefore, we must hold that the oral contract between Denbury and Precision was for an indefinite period and terminable at will.
¶ 27. Denbury was free to terminate the contract, but Precision was entitled to reasonable notice of the termination. We have held that a reasonable time is “an issue for resolution by the jury as to whether appellant’s notice to terminate the contract was reasonable under the circumstances.” [33] Therefore, we reverse and remand for trial as to that issue, and we need not address the remaining issues.
¶ 28. The dissent incorrectly perceives that our “sole reason for reversing and remanding this matter for trial is to have the jury determine whether or not Den-bury gave Precision reasonable notice ....”[34] It is true that our reason for remanding is to have a jury determine the reasonable-notice issue. But our reason for reversing is different. The contract was clearly terminable at will, and the trial judge should have so instructed the jury. Stated another way, the trial judge should have granted Denbury’s motion for directed verdict on that issue.
¶ 29. The dissent also presumes that the jury considered whether Denbury gave *457 reasonable notice to Precision. But the jury was instructed to consider the reasonableness of notice only if it found that the contract was terminable at will. And, based on the damages award in this case, the jury clearly did not find the contract was terminable at will; thus, it never reached the issue of whether Denbury gave reasonable notice.
CONCLUSION
¶30. Denbury and Precision entered into a valid oral contract for Precision to provide Denbury hourly construction and welding services at specified hourly rates. But, because this arrangement was for an indefinite period of time, the contract was terminable at will by either party upon reasonable notice. Because the jury instructions allowed the jury to find that the contract was not terminable at will, we reverse the jury verdict and remand for a new trial as to whether Denbury gave Precision reasonable notice and — should the jury find Denbury did not give reasonable notice — for reasonable damages proximately caused by the lack of reasonable notice.
¶ 31. REVERSED AND REMANDED.
CARLSON, P.J., RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND CHANDLER, JJ.

. U.S. Fid. & Guar. Co. of Miss. v. Martin, 998 So.2d 956, 964 (Miss.2008).

. Adcock v. Miss. Transp. Comm’n, 981 So.2d 942, 948 (Miss.2008) (citing Johnson v. St. Dominics-Jackson Mem'l Hosp., 967 So.2d 20, 22 (Miss.2007)).

. Natchez Elec. & Supply Co. v. Johnson, 968 So.2d 358, 362 (Miss.2007) (citing Blake v. Clein, 903 So.2d 710, 731 (Miss.2005)).

. Adcock, 981 So.2d at 948.

. Alpha Gulf Coast, Inc. v. Jackson, 801 So.2d 709, 720 (Miss.2001).

. Leach v. Tingle, 586 So.2d 799 (Miss.1991).

. Duke v. Whatley, 580 So.2d 1267 (Miss.1991).

. Sun Printing & Publ’g Ass’n v. Remington Paper & Power Co., 235 N.Y. 338, 139 N.E. 470 (1923).

. Id. at 1268-69.

. Id. at 1271.

. Id.

. Id.

. Id.

. Id. at 1273 (emphasis added).

. Id.

. Id. at 1273-74.

. Id.

. Id.

. Deer Creek Constr. Co., Inc. v. Peterson, 412 So.2d 1169, 1172 (Miss.1982).

. American Chocolates, Inc. v. Mascot Pecan Co., Inc., 592 So.2d 93, 95 (Miss.1991).

. HeartSouth, PLLC v. Boyd, 865 So.2d 1095, 1105 (Miss.2003).

. Oliver Wendell Holmes, The Common Law 242 (Howe ed.1963).

. Dixie South Indus. Coating, Inc. v. Mississippi Power Co., 872 So.2d 769, 770 (Miss.Ct.App.2004).

. Philip L. Bruner & Patrick J. O’Connor, Jr., Bruner & O’Connor on Construction Law § 2:20. 76 (West Group 2002) (citing F.A.R. § 16.601(b); 48 C.F.R. § 16.601(b)).

. Dixie South Indus. Coating, Inc., 872 So.2d at 770.

. City of Starkville v. 4-County Elec. Power Ass’n, 819 So.2d 1216, 1232 (Miss.2002).

. Leach, 586 So.2d at 803 (citing Gordon v. Fechtel, 220 Miss. 722, 729-30, 71 So.2d 769, 771 (1954)). This Court has noted that, when option contracts are not at issue, courts may infer a reasonable price; but we need not do that here. Pugh v. Gressett, 136 Miss. 661, 101 So. 691, 698 (Miss.1924) ("An offer to sell goods need not specify the price, for, if no price is stated, it will be presumed that the reasonable market price was intended.”) (citing 13 Corpus Juris 268); 1 Williston on Contracts § 4:25 (4th ed. 2000) (If "no statement as to the wages or price to be paid” is listed, the court will "invoke a standard of reasonableness so that the fair value of the services or property is recoverable.”)

. Leach, 586 So.2d at 803 ("Where, from the terms of the contract, one familiar with elementary principles of mathematical reasoning may deduce with certainty the sales price, the contract will not fail.”) (citing Gordon v. Fechtel, 220 Miss. 722, 729-30, 71 So.2d 769, 771 (1954)). Here, no one could "deduce with certainty the sales price” because the parties never agreed to any particular number of hours.

.American Chocolates, Inc., 592 So.2d at 95 (Miss.1991); Hazell Mach. Co. v. Shahan, 249 Miss. 301, 161 So.2d 618 (1964); U.S. Fin. Co. v. Barber, 247 Miss. 800, 157 So.2d 394 (1963) ("[A] contract for an indefinite period, such as one for employment ... which by its nature is not deemed to be perpetual, may be terminated at any time on giving reasonable notice.”) (citing 2 Corbin on Contracts § 446 (1950); 17A C.J.S. Contracts § 398).

. This affidavit — although in the record— was never admitted into evidence, and the jury never saw it. We refer to its contents only because it summarizes Dickerson’s testimony at trial.

. See Frigaliment Importing Co. v. B.N.S. Intern. Sales Corp., 190 F.Supp. 116, 117 (D.C.N.Y.1960) ("[T]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs-not on the parties’ having meant the same thing but on their having said the same thing.") (citing Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L.Rev. 457 (1897)).

. Boyd, 865 So.2d at 1105.

. First Miss. Bank of Commerce v. Latch, 433 So.2d 946, 950 (Miss. 1983). See also King v. Exxon Co., U.S.A., 618 F.2d 1111, 1119 (5th Cir.1980) (“what constitutes reasonable notice of termination ... is a question to be resolved by the jury, since reasonable notice will vary in accordance with the facts and circumstances of each case.”).

. (Emphasis added.)