# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-60344

United States Court of Appeals
Fifth Circuit

**FILED**

December 12, 2019

Lyle W. Cayce
Clerk

In the Matter of:  CHUCK WILLIS

>  Debtor.

TOWER LOAN OF MISSISSIPPI, L.L.C.,
Doing Business as Tower Loan of Crystal Springs,

>  Appellant,

versus

CHUCK WILLIS,

>  Appellee.

Appeal from the United States District Court
for the Southern District of Mississippi

Before OWEN, Chief Judge, SMITH and DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In adversary bankruptcy proceedings, Chuck Willis sued Tower Loan of Mississippi, L.L.C. ("Tower Loan"), for allegedly violating the Truth in Lending Act ("TILA").  Tower Loan moved to dismiss or compel arbitration.  The bankruptcy court denied the motion, and the district court affirmed.  Tower Loan

No. 18-60344

appeals. Because the parties reached a valid agreement to arbitrate and delegated threshold arbitrability issues to the arbitrator, we reverse and remand with instructions to refer this case to arbitration.

I.

This appeal centers on the relationship between two arbitration agreements that Willis signed in November 2016 when he borrowed money from Tower Loan via an Installment Loan Agreement and Disclosure Statement ("loan agreement"). The loan agreement showed that Willis had also purchased insurance policies; those policies were issued by Tower Loan subsidiaries. In signing the loan agreement, Willis agreed to an arbitration agreement found on its back side ("first arbitration agreement"). And in purchasing the insurance policies, Willis agreed to a separate arbitration agreement ("second arbitration agreement"). Though Tower Loan didn't sign the second agreement, a Tower Loan representative had handed it to Willis for his signature.[1]

The two arbitration agreements are similar but not identical. Start with the similarities. Both broadly require arbitration for all disputes between and among Willis, Tower Loan, and the insurance companies, including any that arise from the loan or the policies. Each agreement binds Willis to arbitrate any dispute with Tower Loan's affiliates. Both delegate to the arbitrator the power to decide gateway arbitrability issues, including whether a given claim is covered. But the agreements conflict over several procedural aspects of the arbitration, relating mainly to the selection and number of arbitrators, time to respond, location, and fee-shifting.

In January 2017, Willis filed for Chapter 7 bankruptcy. About four

---

[1] That fact is not in the record, but counsel for Tower Loan conceded at oral argument that a Tower Loan representative—and not a representative for the insurance companies— handed Willis the second arbitration agreement.

2

No. 18-60344

months later, he sued Tower Loan in an adversary proceeding, alleging that the company had violated the TILA, 15 U.S.C. § 1601 *et seq.*, by providing inaccurate disclosures in the loan agreement. After answering, Tower Loan moved to dismiss or compel arbitration.

The bankruptcy court denied the motion. It held that the first and second arbitration agreements formed a single contract and that the conflicting provisions meant that Willis and Tower Loan hadn't formed a sufficiently definite contract to arbitrate under Mississippi law. The district court affirmed in a terse opinion that added nothing on the merits.[2] Tower Loan appeals, contending that the arbitration agreements should be construed separately and that even if we construe them together, the parties still formed a valid contract.

## II.

"We review *de novo* a ruling on a motion to compel arbitration" and follow "two analytical steps" in doing so. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). We first apply state law to determine whether the parties formed "*any arbitration agreement at all.*" *Id.* Second, we interpret the contract "to determine whether *this* claim is covered by the arbitration agreement." *Id.* The second step is also ordinarily for the court. *Id.* But "the analysis changes" where the agreement delegates to "the arbitrator the primary power to rule on the arbitrability of a specific claim." *Id.* In such a case, we ask only whether there is a valid delegation clause.[3] If there is, then the *arbitrator* decides whether the claim is arbitrable. *Id.*

---

[2] Because the district court's opinion adopted the bankruptcy court's reasoning in its entirety, our references are to the bankruptcy court.

[3] Specifically, we ask whether the clause "evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Kubala*, 830 F.3d at 202.

No. 18-60344

## III.

The first question per *Kubala* is whether, as a matter of Mississippi law,[4] the parties created a valid contract to arbitrate. *Id.* That requires us to resolve two related issues. First, should the arbitration agreements be construed as one contract? Second, assuming we construe them together, did the parties have a meeting of the minds as to arbitration?

### A.  Contract Construction

The bankruptcy court construed the arbitration agreements together, noting that both cover *all* disputes between Willis and Tower Loan. Tower Loan contends that the agreements should be construed separately because Tower Loan assented only to the first arbitration agreement and not the second. The company suggests that because it did not sign or otherwise agree to the second, it cannot be considered a party to it. Hence, on Tower Loan's theory, only the first agreement applies.

We disagree. Under Mississippi law, "when separate documents are executed at the same time, by the same parties, as part of the same transaction, they may be construed as one instrument."[5] All of those requirements are met, so the bankruptcy court properly construed the agreements as one.

First, Tower Loan is a party to the second arbitration agreement just as it is to the first. Tower Loan conceded at oral argument that its representative handed Willis both arbitration agreements to sign. And the agreements are

---

[4] Because the loan agreement has a choice-of-law provision for Mississippi, we apply the law of that state. *See Nethery v. CapitalSouth Partners Fund II, L.P.*, 257 So. 3d 270, 273 (Miss. 2018) (applying Delaware law per the contract's choice-of-law clause in reviewing motion compelling arbitration).

[5] *Sullivan v. Mounger*, 882 So. 2d 129, 135 (Miss. 2004); *accord Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990) ("Under general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together.").

No. 18-60344

closely related. Each requires Willis to arbitrate any dispute involving Tower Loan. Both apply to all disputes that arise from the loan Willis received and the insurance he purchased. Moreover, the loan agreement—to which Tower Loan is indisputably bound—shows that Willis purchased the insurance policies that the company insists are part of an entirely separate transaction.[6]

Next, Tower Loan and Willis executed the two agreements at the same time and as part of the same transaction. As stated above, a Tower Loan representative handed Willis both agreements, and the loan agreement evidences both the loan and the insurance purchases. Accordingly, the arbitration agreements were "executed at the same time, by the same parties, as part of the same transaction." *Sullivan*, 882 So. 2d at 135. We construe them together.

## B. Meeting of the Minds

Next, construing the agreements as one, we decide whether Willis and Tower Loan entered into a valid contract to arbitrate despite inconsistencies in the contractual terms.

### 1.

To form a contract, Mississippi law requires, among other things,[7] "mutual assent"[8] or a "meeting of the minds"[9] as to essential terms, as well as

---

[6] On a related point, Tower Loan avers that the arbitration agreements are separate because Willis supposedly executed them for different purposes—the first to get a loan, the second to purchase insurance. We see it differently. As already noted, the loan agreement shows that Willis purchased the insurance. And each arbitration agreement states that it applies to any dispute arising from *both* the loan *and* the insurance. So, it makes little sense to say that the agreements were executed for different purposes.

[7] Mississippi law also requires that there be multiple contracting parties with legal capacity, consideration, and no "legal prohibition precluding contract formation." *See GGNSC Batesville, LLC v. Johnson*, 109 So. 3d 562, 565 (Miss. 2013). Willis and Tower Loan don't dispute that those elements are met.

[8] *GGNSC Batesville, LLC*, 109 So. 3d at 565.

[9] *Howard v. TotalFina E & P USA, Inc.*, 899 So. 2d 882, 889 (Miss. 2005).

No. 18-60344

a contract that is "sufficiently definite" to "enable the court under proper rules of construction to ascertain its terms." *Leach v. Tingle*, 586 So. 2d 799, 802 (Miss. 1991). A "[d]etermination that an agreement is sufficiently definite is favored in the courts, so as to carry out the reasonable intention of the parties if it can be ascertained." *Jones v. McGahey*, 187 So. 2d 579, 584 (Miss. 1966). Thus, "[a] court will, if possible, interpret doubtful agreements by attaching a sufficiently definite meaning to a bargain if the parties evidently intended to enter into a binding contract." 1 WILLISTON ON CONTRACTS ("WILLISTON") § 4:21 (4th ed. 2019). Mississippi courts have not addressed whether conflicting terms in an arbitration agreement prevent a contract from forming.

2.

The bankruptcy court identified several terms in conflict between the two arbitration agreements. They relate to (1) the number of arbitrators,[10] (2) selection of arbitrators,[11] (3) time allowed to respond,[12] (4) location of the arbitration,[13] (5) who pays the arbitration costs,[14] (6) who is entitled to

---

[10] The first agreement requires a single arbitrator. The second provides for one arbitrator but permits either party to request a panel of three—provided that the requesting party agrees to pay the extra costs.

[11] Both agreements state that the parties should mutually select an arbitrator. The first agreement provides that if the parties cannot agree, then the Federal Arbitration Act's selection provisions will apply. But under the second agreement, if the parties can't agree, then the National Arbitration Forum will appoint the arbitrator.

[12] The first agreement gives a party thirty days to deliver an answering statement after receiving notice of the demand for arbitration. The second allows only twenty.

[13] The first agreement requires that the arbitration take place in Rankin County, Mississippi, unless the borrower requests that it be held in his county of residence or principal place of business. But the second agreement requires that the arbitration be held in the borrower's county of residence unless the parties agree otherwise.

[14] The first agreement requires the lender to "pay the arbitrator's fees and expenses for the first two days of [the] hearings," and it directs the arbitrator to require the parties to "pay his or her fees and other costs according to the relative fault of the parties." But the second agreement requires the "company" to "pay all costs of the arbitration, except that each party must" pay for its own attorneys, experts, and witnesses.

attorneys' fees and on what showing,[15] and (7) when arbitration doesn't apply.[16] The court held that those inconsistencies prevented a meeting of the minds, so Willis and Tower Loan hadn't agreed to arbitrate.

For that conclusion, the bankruptcy court relied mainly on *Ragab v. Howard*, 841 F.3d 1134 (10th Cir. 2016), which applied Colorado contract law. There (as here) the court analyzed multiple arbitration agreements that had conflicting procedural terms and held that the inconsistencies precluded a meeting of the minds. *See id.* at 1136–38. Justice (then-Judge) Neil Gorsuch dissented and would have concluded that the parties had agreed to arbitrate. *Id.* at 1139–41 (Gorsuch, J., dissenting). He urged that even if the parties "differ[ed] on the details concerning *how* arbitration should proceed," they united "on the fundamental question whether they wish[ed] to arbitrate or not." *Id.* at 1139, 1141. The rest was minor procedural detail. *See id.* at 1139.

3.

Willis asks us to follow *Ragab* and hold that the conflicting provisions thwarted a meeting of the minds. We decline his request. The parties' intentions were unmistakable: They wished to arbitrate any dispute that might arise between them. Not once but twice they stated that any dispute arising from the loan Willis purchased should be arbitrated. Both agreements broadly cover "all claims and disputes between" Willis and Tower Loan, and both embrace any federal-law claim that Willis brings. The parties thus "evidently intended to enter into a binding contract." 1 WILLISTON § 4:21. We have more

---

[15] The first agreement doesn't say which party must pay fees for attorneys, experts, and witnesses. But the second agreement says that each party must bear its own costs in those regards unless the arbitrator decides otherwise.

[16] The first agreement dont states that the lender isn't required to arbitrate "for collection matters of $10,000 or less" or before the lender "repossess[es] collateral or foreclos[es] upon real property." The second agreement contains no such carve-out.

No. 18-60344

than enough to ascertain the terms. *See Leach*, 586 So. 2d at 802.

The conflicting provisions do not change that result. Though the agreements differ over procedural details, they speak with one voice about *whether to arbitrate.* We thus find good company in Justice Gorsuch: We will not shut our eyes to an agreement that demonstrates a baseline intent to arbitrate just because it contains inconsistent terms about procedural minutiae. *See Ragab*, 841 F.3d at 1139–41 (Gorsuch, J., dissenting).

Willis points out that contracts fail for indefiniteness where they don't set out matters such as the price in a first-refusal contract or rent owed under a lease.[17] So too here, he contends, we should find the contract indefinite because of the inconsistencies. But the conflicting terms here aren't like the essential terms of price and rent. Instead, they concern such innocuities as the number of arbitrators, location, and fee shifting. As Willis concedes, procedural terms about "time for performance and time for payment are non-essential."[18] The inconsistent terms here are similarly non-essential. Hence, under Mississippi law, the parties validly contracted to arbitrate.

IV.

Ordinarily the next step—after concluding that there is a valid agreement—is to determine whether *this* claim is arbitrable. *See Kubala*, 830 F.3d at 201. But because Tower Loan has pointed to a delegation clause, we ask only whether the parties "evince[d] an intent to have the arbitrator

---

[17] *See Intrepid, Inc. v. Bennett*, 176 So. 3d 775, 778–79 (Miss. 2015) ("Without a definite agreement as to the amount of rental, there can be no binding lease contract."); *Duke v. Whatley*, 580 So. 2d 1267, 1273 (Miss. 1991) (refusing to enforce a first-refusal contract with a missing price).

[18] *See, e.g.*, *Etheridge v. Ramzy*, 276 So. 2d 451, 454 (Miss. 1973) (recognizing that time for payment isn't an essential term); *Smith v. Mavar*, 21 So. 2d 810, 811 (Miss. 1945) (noting that time for performance isn't an essential term).

decide whether a given claim must be arbitrated." *Id.* at 202. They did. Each arbitration agreement has a delegation clause that mirrors the one we held valid in *Kubala*.[19]  Hence, it is for the arbitrator—not us—to decide whether Willis's TILA claim is arbitrable. *See id.* It is similarly the arbitrator's province to resolve the inconsistent procedural terms.[20]

\* \* \* \*

For the foregoing reasons, the order denying Tower Loan's motion to dismiss or compel arbitration is REVERSED, and we REMAND to the district court and direct it to refer the dispute to arbitration.

---

[19] The delegation clause in *Kubala*, 830 F.3d at 204, stated that

> [t]he arbitrator shall have the sole authority to rule on his/her own jurisdiction, including any challenges or objections with respect to the existence, applicability, scope, enforceability, construction, validity and interpretation of this Policy and any agreement to arbitrate a Covered Dispute.

The delegation clause in the first arbitration agreement states that

> [t]he Arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the Arbitration Agreement, or the to the [*sic*] arbitrability of any claim or counterclaim.

The delegation clause in the second arbitration agreement states that the agreement applies to disputes over "[w]hether the claim or dispute must be arbitrated" and "the validity of this arbitration agreement."

[20] *See, e.g., BG Grp. PLC v. Republic of Arg.*, 572 U.S. 25, 34 (2014) (recognizing general presumption that "the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration"); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("Procedural questions which grow out of the dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator, to decide." (cleaned up)).

No. 18-60344

JAMES L. DENNIS, Circuit Judge, dissenting:

I respectfully dissent.  In my view, the bankruptcy court properly applied state law and common law contract principles in deciding there was not a meeting of the minds or mutual assent on a contract to arbitrate.  Hence, the bankruptcy court and district court judgments refusing to order arbitration should be affirmed.  The majority of this panel reverses, however, following a dissent in the Tenth Circuit Court of Appeals that relied on a unique analogy to the "battle of forms" concept in UCC cases.  *See Ragab v. Howard*, 841 F.3d 1134, 1140 (10th Cir. 2016) (Gorsuch, J., dissenting).  The merit of that dissent's reasoning is debatable and does not appear to have been applied by any court to decide a meeting of the minds issue with respect to arbitration.  If it is ever applied, its use should be limited to the kind of case and contract with respect to which it was conceived: a case that "involves parties to a commercial, not a consumer, transaction, with contracts actively negotiated by both sides, not contracts of adhesion thrust upon the plaintiff."  *Id.*  Indeed, it is precisely because *Ragab* involved transactions between knowledgeable merchants that the *Ragab* dissent deemed the battle of the forms—in which "conflicting terms [on merchants' standardized forms] . . . knock each other out but do not void [a] contract"—an apt analogy.  *Id.*  The present case, by contrast, involves ordinary consumer loan and insurance contracts that were presented to Willis, a mechanic and truck driver, without his having had the benefit of counsel or bilateral negotiation, but on a take it or leave it basis.  Given this consumer transaction context, I agree with the bankruptcy court that an analogy to the "mirror image" rule, where neither party is bound when the acceptance differs from the offer, is more appropriate.  Accordingly, I believe the majority falls into serious error in adopting the *Ragab* dissent as a model for deciding the issue of mutual assent in consumer transactions in our circuit.

No. 18-60344

The Supreme Court has repeatedly reaffirmed that the Federal Arbitration Act (FAA) "declare[s] a national policy favoring arbitration of claims that parties contract to settle in that manner." *Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (alteration in original) (internal quotation marks and citation omitted). In determining whether to enforce an arbitration agreement, our circuit follows "two analytical steps. The first is contract formation— whether the parties entered into *any arbitration agreement at all*. The second involves contract interpretation to determine whether *this* claim is covered by the arbitration agreement." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). The initial question, therefore, is whether as a matter of state contract law, the parties have entered into a valid arbitration agreement. *See id.* at 202. Importantly, the "federal policy favoring arbitration does not apply to th[is] determination." *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073–74 (5th Cir. 2002), *opinion supplemented on denial of reh'g*, 303 F.3d 570, 571 (5th Cir. 2002).

Under Mississippi law, a meeting of the minds is required to form a contract. *See Brooks v. Brooks*, 111 So. 376, 377 (Miss. 1927). As the majority notes, there is no Mississippi caselaw on whether conflicting terms in arbitration agreements may prevent a meeting of the minds and thus thwart the formation of a contract to arbitrate. However, two courts in outside jurisdictions have addressed this subject and concluded that the parties in each case did not agree to arbitrate. *See Ragab*, 841 F.3d at 1138; *NAACP of Camden Cty. E. v. Foulke Mgmt. Corp.*, 24 A.3d 777, 794 (N.J. Super. Ct. App. Div. 2011). The majority makes scant mention of the principal holding in the first case, *Ragab v. Howard*, focusing almost solely (and misguidedly) on the dissent by then Judge (now Justice) Gorsuch and does not even cite the *NAACP of Camden Cty. E. v. Foulke Mgmt. Corp.* decision. An examination of the

11

No. 18-60344

*Ragab* majority opinion and *NAACP*, however, shows that their reasoning is persuasive and ought be applied here.

In *NAACP*, a consumer who was buying a new vehicle signed various documents provided by the dealership in connection with her purchase. 24 A.3d at 780, 794-95. Several of the forms contained arbitration provisions, which conflicted with respect to the following material terms: (1) the venue of the arbitration, (2) which arbitration organization's rules would govern, (3) the time by which arbitration must be initiated, (4) how the costs of arbitration would be allocated, including whether a party was liable for attorneys, experts, and witness fees and on what showing, and (5) class-action waiver provisions. *Id.* at 794-95. After a dispute arose between the parties, the dealership moved to compel arbitration. *Id.* at 780. A New Jersey appeals court determined that there was no "meeting of the minds" on the issue of arbitration and thus no enforceable arbitration agreement because "[v]iewed in their totality, the arbitration provisions . . . are too plagued with . . . inconsistencies to put a reasonable consumer on fair notice of their intended meaning." *Id.* at 794.

Similarly, in *Ragab,* the Tenth Circuit majority confronted multiple arbitration agreements that conflicted over "(1) which rules will govern, (2) how the arbitrator will be selected, (3) the notice required to arbitrate, and (4) who would be entitled to attorneys' fees and on what showing." *Ragab*, 841 F.3d at 1136. Applying Colorado law, the Tenth Circuit affirmed the district court's denial of a motion to compel arbitration. *Id.* Like the *NAACP* court, the Tenth Circuit concluded that the multiple inconsistencies thwarted a meeting of the minds—a requirement under state law to form a contract. *Id.* at 1137-38 (citing *Agritrack, Inc. v. DeJohn Housemoving, Inc.*, 25 P.3d 1187, 1192 (Colo. 2001)).

In the present case, the two arbitration agreements contain *seven* conflicting terms, which the majority inappropriately downplays as differences over mere "procedural minutiae."  In the majority's view, these discrepancies do not defeat the conclusion that the parties agreed on the fundamental question of whether to arbitrate.  Far from conflicting exclusively over a few "procedural details," however, the variances here are like those in *NAACP* and *Ragab*: numerous and material, concerning terms that go to the heart of arbitration.  *See Ragab*, 841 F.3d at 1138; *NAACP*, 24 A.3d at 794; *see also Rotenberry v. Hooker*, 864 So.2d 266, 270 (Miss. 2003) (noting that under Mississippi law, "[a] contract is unenforceable if the material terms are not sufficiently definite").

Take, for instance, the discrepancy over how long a party has to respond to a notice of demand for arbitration.  While the first agreement provides for thirty days to deliver an answering statement after receiving notice, the second agreement permits only twenty days. A significant cost follows from filing an untimely answering statement: the opposing party is entitled to select the arbitrator.  The length of time to respond to the notice is, thus, an important aspect of this agreement, and the ten-day difference in time to file a reply is a material distinction.  Indeed, a difference over the length of notice required prior to proceeding to arbitration was one of the four conflicts in *Ragab* deemed significant enough to preclude formation of an agreement to arbitrate.  *See Ragab*, 841 F.3d at 1136.

Like the arbitration agreements in *NAACP*, the agreements here also differ over the location of arbitration.  *See* 24 A.3d at 794.  While the first agreement requires that the arbitration be held in Rankin County, Mississippi, unless the borrower requests in the demand for arbitration or answering statement that it to be held in his county of residence, the second agreement

states the arbitration will occur in the borrower's county of residence. The impact of this distinction is reduced somewhat because the first agreement empowers the borrower to move the arbitration to her county of residence, thus aligning the agreements. However, the borrower can only do so if (when the borrower is the party answering a demand) she timely files an answering statement—and, as explained, the time by which a party must file such a statement is uncertain.

As with the arbitration provisions at issue in *Ragab*, the agreements here further conflict regarding how the arbitrator will be selected. *See Ragab*, 841 F.3d at 1136. The first agreement states that if the parties are unable to agree upon an arbitrator then the provisions of the Federal Arbitration Act (FAA) govern. *See* 9 U.S.C. § 5. Under the FAA, the court designates the arbitrator. *Id.* Conversely, the second arbitration agreement provides that in the event the parties do not agree upon the arbitrator then the National Arbitration Forum (NAF) will appoint the arbitrator.[1]

The most glaring—and material—difference between the agreements concerns who pays for the arbitration. This is analogous to both *NAACP* and *Ragab*; in those cases, inconsistencies between provisions on how the costs of arbitration would be allocated were key to the courts' determination that there was no meeting of the minds to arbitrate. *See Ragab*, 841 F.3d at 1136; *NAACP*, 24 A.3d at 795. Here, the first agreement requires the lender to "pay the arbitrator's fees and expenses for the first two days," yet later says that the

---

[1] The bankruptcy court noted that, following litigation, the NAF agreed to permanently stop administering arbitrations involving consumer debt. Thus, under the second agreement, it is unclear how an arbitrator will be selected if the parties cannot agree on whom to appoint.

"arbitrator shall direct the parties to pay his or her fees and other costs according to the relative fault of the parties." The bankruptcy court recognized this "internal[] inconsistency" in the first agreement. As if that weren't confusing enough, the second agreement requires Tower Loan to "pay all the costs of the arbitration, except that each party" pays for its own attorneys, experts, and witnesses. In view of these contradictions—both internal and otherwise—the bankruptcy court aptly opined that it couldn't "discern whether Tower Loan pays none, some, or all of the costs" of the arbitration.

As demonstrated, the extent of the conflicting terms here parallels the contradictory provisions in *Ragab* and *NAACP*. *See Ragab*, 841 F.3d at 1136; *NAACP*, 24 A.3d at 794-95. Indeed, the differences here are more numerous than in either of those cases. Without rehashing the details of the other remaining differences between the agreements—including over the number of arbitrators—it suffices to say that these conflicting terms are so copious and of such considerable import that there was no meeting of the minds. *See Brooks v. Brooks*, 111 So. 376, 377 (Miss. 1927).

While the sheer number of discrepancies militates in favor of a determination that there was no formation of a contract to arbitrate, this conclusion is further supported by the nature of the conflicts. I simply cannot agree with my colleagues' conclusion that these inconsistencies relate only to "non-essential" provisions. For instance, the matter of who pays for the arbitration is more akin to the essential term of price in a contract than it is to a mere "procedural detail" of the arbitration. *See Leach v. Tingle*, 586 So. 2d 799, 803 (Miss. 1991) (noting that price is an essential term of a contract); *see also Ragab*, 841 F.3d at 1137 (finding that the three conflicting provisions prevented an agreement "upon all essential terms" (quoting *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986))); *NAACP*, 24

A.3d at 798 (describing the conflicting terms as relating to "material parts of the arbitration"). It is also worth observing that this is not a case where one of the agreements contains a merger clause, which could potentially permit that agreement's arbitration clause to supersede the other one, thereby resolving the problem of the conflicting provisions. *Cf. Ex parte Palm Harbor Homes, Inc.,* 798 So.2d 656, 660-61 (Ala. 2001) (compelling arbitration pursuant to the terms contained in a contract with a merger clause because the merger clause caused that contract to supersede other agreements that had differing arbitration provisions).

The arbitration provisions here are "too plagued with . . . inconsistencies to put a reasonable consumer on fair notice of their intended meaning." *Ragab*, 841 F.3d at 1138 (quoting *NAACP*, 24 A.3d at 794). What's more, arbitrarily enforcing the terms of one agreement "[w]ould violate the other" agreement. *Id.* In sum, the cumulative effect of the conflicting terms compels the conclusion that there was no mutual assent to arbitrate, and thus Willis cannot be forced to arbitrate. *See GGNSC Batesville, LLC v. Johnson*, 109 So. 3d 562, 565 (Miss. 2013) (stating that "mutual assent" is an essential term of a contract).

For these reasons, I respectfully dissent.