276 So.2d 451 (1973)
T.H. ETHERIDGE et al.
v.
C.T. RAMZY et al.
No. 47003.
Supreme Court of Mississippi.
March 12, 1973.
Rehearing Denied May 7, 1973.
Watkins, Pyle, Ludlam, Winter & Stennis, William A. Pyle, Ernest G. Taylor, Jr., Jackson, for appellants.
Daniel, Coker, Horton, Bell & Dukes, Donald V. Burch, Jackson, Harold W. Davidson, Carthage, for appellees.
RODGERS, Presiding Justice:
This appeal arises out of a suit for specific performance brought in the Chancery Court of Leake County, Mississippi. The chancellor sustained the general demurrer of appellees wherein it is contended that the contract in question was too indefinite to be enforced. In prosecuting this appeal, appellants argue that the chancellor erred in his decision, and they submit that they are entitled to specific performance on the contract, or in the alternative, to damages for breach of contract.
The appellants, the estate of M.D. Reagan, and other members of the family of *452 M.D. Reagan, and the appellees  C.T. Ramzy, his wife, his son, and his daughter  each owned fifty percent (50%) of the capital stock of each of the following five corporations: R & R Milling Company, Inc.; R & R Processors, Inc.; R & R Farms, Inc.; R & R Hatchery, Inc.; and R & R Packing Company, Inc.
As a result of an increasingly acrimonious relationship between appellants and appellees, the litigants herein decided that the continued success of their jointly owned businesses would require that ownership be consolidated in one of the two families holding stock in the R & R Corporations. On June 21, 1971, a meeting was conducted at which the stockholders of the R & R Corporations discussed the possibility of entering into an agreement for the sale and purchase of R & R stock among the present shareholders. At the conclusion of this meeting, it was agreed that appellees should select a certified public accountant to study the financial and managerial aspects of the five R & R corporations. The accountant's report recommended that appellees be given the first option to purchase all of the appellants' stock in the five corporations. Pursuant to this recommendation, on June 28, 1971, C.T. Ramzy, on behalf of the appellees, and M.D. Reagan, acting for the appellants, entered into an oral agreement under which the appellees would have fifteen (15) days in which to exercise an option to buy all the stock of appellants in the five corporations. It was further agreed that if appellees failed to exercise their option within fifteen (15) days, the option to buy the five corporations would then pass to appellants.
Near the end of the first option period appellees requested that they be given an extension of time on their option to buy. In response to this request, the parties drafted a written "Buy and Sell Agreement  letter of intent" dated July 12, 1971, which incorporated essentially the same terms as were contained in the earlier oral agreement. The written agreement is hereto attached.[1]
*453 Under the terms of the attached "letter of intent", appellees were given until July 15, 1971, in which to exercise their option. If appellees failed to exercise their option within the fifteen-day period, then appellants were to acquire the right to purchase appellees' stock in the corporations.
By July 17, 1971, (two days after the expiration date), appellees had not exercised their option, and the appellants thereupon notified appellees that the option to purchase had passed to them, and they (appellants) intended to purchase appellees' stock in the R & R corporations. However, when appellants drafted a second written agreement setting forth the details for the stock transfer, appellees refused to sign the agreement or to convey their one-half (1/2) interest in the R & R corporations to appellants. Hence, appellants appeal to this Court from a decision of the Chancery Court of Leake County, Mississippi, sustaining appellees' demurrer to appellants' bill of complaint seeking specific performance upon the agreement of July 12, 1971.
The validity and enforceability of the contract of July 12, 1971, forms the sole issue relating to the disposition of this appeal. Appellants contend that the July 12, 1971, contract is sufficiently certain and definite to compel appellees to enter into the new contract of August 25, 1971, wherein the exact terms of the stock transfer are enumerated.
There is an overwhelming body of law with respect to agreements to enter into future contracts which is aptly represented by the following extracts from American Jurisprudence 2d Series:
"A contract is not necessarily lacking in all effect merely because it expresses *454 the idea that something is left to future agreement.
* * * * * *
However, unless an agreement to make a future contract is definite and certain upon all the subjects to be embraced, it is nugatory. To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations. Where a final contract fails to express some matter, as, for instance, a time of payment, the law may imply the intention of the parties; but where a preliminary contract leaves certain terms to be agreed upon for the purpose of a final contract, there can be no implication of what the parties will agree upon. If any essential term is left open to future consideration, there is no binding contract, and an agreement to reach an agreement imposes no obligation on the parties thereto." (Emphasis added) 17 Am.Jur.2d Contracts § 26, at 362 (1964).
See also 17 C.J.S. Contracts § 49, at 695-697 and 702-704 (1963).
In a like manner, Professor Corbin, in his treatise on contracts suggests:
"It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent documentary agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called `contract to make a contract' is not a contract at all." (Emphasis added) 1A. Corbin, Contracts § 29, at 84-85 (1963).[2]
In examining the letter of July 12, 1971, there are several indications that the letter is nothing more than a memorandum expressing an intent to enter into a future contract as opposed to an enforceable option agreement. For instance, paragraph 6 contemplates that a "formal buy and sell agreement" be drafted in which there are to be certain undescribed covenants concerning the maintenance of an "adequate" net worth to indebtedness ratio, as well as other covenants to control the amount of salaries to be paid to corporation officers and dividends to be paid to stockholders. Obviously, future negotiations must have been contemplated on the exact nature and contents of these covenants. The control over officers' salaries and divident payments is clearly a critical aspect of this stock transfer agreement. Due to the vagueness and uncertainty of paragraph 6, it is apparent that there was no agreement on the essential terms of the covenants mentioned in the letter of July 12, 1971.
Another element of the July 12, 1971, agreement which indicates that the parties failed to enter into an enforceable option concerns the security arrangements discussed in paragraph 8 of the letter. Paragraph 8 provides that the notes given in payment of the one million one hundred thousand dollar ($1,100,000.00) balance be secured by a pledge of all of the stock purchased under the agreement. This security arrangement is, by itself, inadequate to expressly delineate the rights of the purchaser *455 or the obligations of the buyer. In the absence of express guidelines, this Court cannot now allow enforcement of an agreement, where to do so would be to risk the imposition of inadequate security for the buyer or unfair obligations upon the purchaser.
This Court has long recognized that an agreement must be definite and certain in order to be enforceable. See 17 Am.Jur.2d Contracts § 75 (1964). Welsh v. Williams, 85 Miss. 301, 37 So. 561 (1904) contains an exegesis of this rule of law which states:
"The elementary general rule, as frequently enunciated in reference to the enforcement of specific performance of contracts, so far as relates to the particular branch of the subject here presented for consideration, is that the contract must be specific and distinct in its terms, plain and definite in its meaning, and must show with certainty that the minds of the parties had met and mutually agreed as to all its details upon the offer made upon the one hand and accepted upon the other. If any of these requisites be lacking, specific performance will not be decreed by a court of equity." 85 Miss. at 303-304, 37 So. at 561.
See also Jackson v. Sam Finley, Inc., 366 F.2d 148 (5th Cir.1966); Quick and Grice v. Ashley, 227 Miss. 273, 86 So.2d 40 (1956); Garnett v. Kirkman, 33 Miss. (4 George) 389 (1856); S. Williston, The Law of Contracts § 37 (3d ed. 1957).
The above cited decisions are in line with the expression of the law contained in the Restatement of Contracts. Section 32 of the Restatement reads as follows:
"(1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
(3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance." Restatement (Second) of Contracts § 32 (Tent. Draft No. 1, 1964).
However, there is also authority to indicate that contracts should receive a reasonable construction in order to determine the intention of the contracting parties. In Jones v. McGahey, 187 So.2d 579 (Miss. 1966), we held:
"Determination that an agreement is sufficiently definite is favored in the courts, so as to carry out the reasonable intention of the parties if it can be ascertained. A contract is sufficiently definite if it contains matter which will enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence. Having found a contract to have been made, an agreement should not be frustrated where it is possible to reach a reasonable and fair result. Corbin, Contracts § 95 (1963); 17 Am.Jur.2d Contracts §§ 75-77 (1964); cf. Russell v. Douglas, 243 Miss. 497, 504, 138 So.2d 730 (1962)." 187 So.2d at 584.
And, in Hutton v. Hutton, 239 Miss. 217, 119 So.2d 369 (1960), this Court similarly observed:
"It is definitely settled that the words of a contract should be given a reasonable construction, and that court `must, if possible, ascertain and give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles.' See Rubel v. Rubel, 221 Miss. 848, 75 So.2d 59, 65, 47 A.L.R.2d 1410, and the authorities there cited." 239 Miss. at 229-230, 119 So.2d at 374.
We are inclined to agree with the decision of the chancellor that this doctrine, sometimes called "id certum est quod certum *456 reddi" (that is certain which can be made certain) is inapplicable to the instant case. In referring to the covenants mentioned in the contract, the chancellor observed that, "There are essential elements of the agreement of July 12, 1971, which cannot be cured by extrinsic evidence."
We agree that the provisions of paragraph 6 of the contract of July 12, 1971 are too indefinite and uncertain to allow enforcement of the second written agreement. Paragraph 6 states that covenants will be drafted to provide for the maintenance of "adequate" net worth to liability ratios as well as covenants to limit the payment of salaries and dividends. When the importance of these provisions is considered in light of the language of the paragraph, it is obvious that further negotiations must have been contemplated on the terms of the letter, and as such, the letter is nothing more than a memorandum of intent. Therefore, the contract of July 12, 1971 is too indefinite upon essential terms to be enforced.
Affirmed.
INZER, ROBERTSON, WALKER and BROOM, JJ., concur.
NOTES
[1] M.D. Reagan, July 12, 1971
Carthage, Mississippi.

RE: Buy and Sell Agreement  letter of intent.
Dear Mr. Reagan:
This will confirm our agreement wherein I have agreed to purchase from you, your wife, children and their spouses combined interest in the following companies:
R&R Milling Co., Inc., R&R Processors, Inc., R&R Farms, Inc., R&R Hatchery, Inc., R&R Packing Company, Inc.,
of which your group owns 50% of the total outstanding stock, and you have agreed for and on behalf of your group to sell said stock on the following terms:
1. A cash down payment of $150,000.00, the exact companies to which each part of the purchase price may be applied at your option.
2. A balance payable over a period of 13 years in the aggregate sum, both principal and interest, without option of prior payment except in event of my death; said balance will aggregate to the sum of $1,100,000.00, if the note runs to maturity; however, the note will be a sum, in such amount as will be amortized at the rate of 5% per annum payable annually, and will be carried on the books at such smaller sum, with one year payment to be shown as current liabilities and balance as long term debt.
3. I propose to deposit in escrow with The Carthage Bank on or before July 15, 1971, the sum of $150,000.00 in cash to be raised by me from sources outside the company as a guaranty that I will take care of and perform my obligations hereunder and make the down payment.
4. Further, on or before July 15, 1971, I will furnish you a letter from The Carthage Bank and Deposit Guaranty National Bank to the effect that my obtaining the $150,000.00 from personal sources will not impair the present line of credit of the above companies with said banks and that your group will be relieved from any personal liability for any obligations now outstanding or hereafter created by the companies, and that the banks wil continue the present line of credit so long as the statements of the company justify same.
5. I will sign, together with the members of my group, a pledge that so long as I am indebted to your group that we will not pledge our remaining 50% Stock in the above companies to secure any personal indebtedness.
6. If I obtain these letters, then it is agreed that I shall have a period of 30 days for us to draw a formal buy and sell agreement, which shall include covenants that an adequate ratio of total net worth of the companies to my indebtedness to you will be maintained; a limitation on salaries and dividends to be paid, the furnishing of monthly financial statements, reasonable access to the books during reasonable hours, and weekly cash flow reports. Upon the drawing of such an agreement, the original and all copies of this agreement shall be delivered to J.E. Smith, Attorney, of Carthage, Mississippi, for destruction.
7. In event I am unable to deposit and said money in escrow and furnish such letters from the banks as called for herein in items 3 and 4 hereof by July 15, 1971, then in such event, you shall have the option to purchase the interest of myself, my wife and our children in said companies, on the same terms, and shall have until August 2, 1971, to deposit such sum as down payment hereinabove provided in The Carthage Bank and obtain the same letters from The Carthage Bank and Deposit Guaranty National Bank as required by me.
8. As security for said indebtedness promissory notes will be executed by me, and if I desire to sell any of said stock to my children, or their spouses, or have them by same, I and my wife will co-sign their note. The same will be expected of you. Said note or notes will be secured by a pledge or assignment complying with the Uniform Commercial Code of the State of Mississippi, of all stock purchased under this agreement.
9. In event of death of buyer prior to maturity, seller or his heirs, may be required to accept payment of the balance then owing, in which event interest on the unpaid balance of principal will be accrued to date of payment and no further interest may accrue thereafter.
10. As additional security buyer will procure life insurance on his life, in an amount equal to the principal sum of the outstanding debt, which may be decreasing term insurance, in such amount as would at all times fully cover the outstanding indebtedness owing the selling group. In event I am unable to procure the required funds and documents to exercise this option, permission is given you to insure the life of T.H. Etheridge, to cover my family, on the same terms.
 Very truly yours,
 /s/ C.T. Ramzy 
 C.T. Ramzy
 Accepted on the above terms,
 this the 12th day of July,
 1971.
Witnesses: /s/ M.D. Reagan 
/s/ M.M. Winkler M.D. Reagan
Tupelo, Miss. 
Witnesses:
/s/ J.R. Gipson 
 Philadelphia, Miss. 

[2] See also Western Airlines, Inc. v. Lathrop Company, 499 P.2d 1013, 1019 (Alas. 1972); Chu v. Ronstadt, 17 Ariz. App. 486, 498 P.2d 560, 563 (1972); Coleman Engineering Co. v. North American Aviation, 65 Cal.2d 396, 55 Cal. Rptr. 1, 420 P.2d 713, 719-720 (1966); Weil & Assoc. v. Urban Renewal Agency of Wichita, 206 Kan. 405, 479 P.2d 875, 885 (1971); Hansen v. Catsman, 371 Mich. 79, 123 N.W.2d 265, 266-267 (1963); O'Neil v. Powell, 470 S.W.2d 775, 779 (Tex.Civ. App. 1971); Schlusselberg v. Rubin, 465 S.W.2d 226, 227 (Tex.Civ.App. 1971); Mattox v. Davis, 437 S.W.2d 308, 310 (Tex.Civ.App. 1969); Page & Wirtz Constr. Co. v. Van Doran Bri-Tico Co., 432 S.W.2d 731, 734-735 (Tex.Civ.App. 1968); S. Williston, The Law of Contracts § 45 (3d ed. 1957).