# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-CA-00669-SCT

*JOHN LOGAN, SAMANTHA LOGAN, MEDPLUS URGENT CLINIC, LLC, MEDEX, LLC, M2 BILLING COMPANY AND WILLIAM SMOTHERS*

*v.*

*REDMED, LLC, COVENANT INVESTMENTS SERIES II, INC., M&K EQUIPMENT RENTALS, LLC, DR. MICHAEL TURNER, KAROL TURNER, MEDPLUS OXFORD, LLC, DR. JASON DIGBY AND DIGBY FAMILY HOLDINGS, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/20/2022 |
| TRIAL JUDGE: | HON. GRADY FRANKLIN TOLLISON, III |
| TRIAL COURT ATTORNEYS: | HUGH RUSTON COMLEY |
| | TREMARCUS D'RAY KESHON ROSEMON |
| | CLAUDE F. CLAYTON, JR. |
| | DANA GAIL DEARMAN |
| | T. SWAYZE ALFORD |
| | JOHN BOOTH FARESE |
| | JOHN MATTHEW ORR |
| | GOODLOE TANKERSLEY LEWIS |
| | LAURANCE NICHOLAS CHANDLER ROGERS |
| | J. MARK SHELTON |
| | KAYLA FOWLER WARE |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | GREGORY M. HUNSUCKER |
| | CHARLES L. BALCH, III |
| ATTORNEYS FOR APPELLEES: | HUGH RUSTON COMLEY |
| | T. SWAYZE ALFORD |
| | JESSIE WAYNE DOSS, JR. |
| | BRIANA ANTOINETTE O'NEIL |
| | KAYLA FOWLER WARE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 01/11/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     The parties are estranged former business associates.  Together they owned and operated various urgent care medical clinics in north Mississippi.  A series of events led them to sue each other in five separate but related lawsuits in the Chancery Court of Lee County, the Chancery Court of Itawamba County, and the Circuit Court of Lafayette County.

¶2.     All parties to all of the above-described civil actions attended a mediation at the Lafayette County Courthouse on July 8, 2021.  The issue for us today is what, if anything, resulted from the mediation.  RedMed believed there was an enforceable settlement agreement, and Logan believed the mediation created only a framework for further negotiations.  On October 1, 2021, the circuit court granted RedMed's Motion to Enforce Settlement.  Logan now appeals, claiming the trial court erred by finding a binding settlement agreement.  Because the proposed settlement agreement lacks material terms required by Mississippi contract law, and therefore no meeting of the minds occurred, we reverse.

## FACTS

¶3.     Given the multiplicity of litigation in different counties involving numerous parties and Logan, clearly labeling the parties to the instant appeal presents a challenge.  To simplify matters, we refer to them according to the roles they played in the Lafayette County litigation, which is the litigation that spawned the instant appeal.

¶4.     The defendants are a group of individuals and companies connected to John Logan.  Samantha Logan is his wife.  She has sometimes been involved in the actual management of

2

the clinics, but at other times, she has been an ownership figurehead used by Logan to circumvent non-compete clauses. William Smothers is Logan's business associate who has organized many of the LLCs involved in the business. Medex, LLC, is Logan's management company, M2 Billing is his billing company, and MedPlus Urgent Clinic, LLC, is his clinic in Tupelo.

¶5.     The plaintiffs are a mix of investors and former investors in clinics that Logan has run. The most common orientation of the relationship between the parties is that the plaintiffs provide the investment and Logan provides the management of the clinics, but that has changed over time.

¶6.     Logan initially managed clinics for RedMed. In 2015, while he was still a shareholder in RedMed's parent company, Covenant Investing Series, II, Inc, Logan opened a competing clinic, MedPlus Urgent Care, LLC, under his wife's name. The other shareholders sued Logan, alleging breaches of his duties as a managing shareholder. The parties negotiated a settlement agreement and executed it on January 26, 2017. The agreement separated Logan from RedMed and Covenant in exchange for a cash buyout. It also contained a non-compete clause that prevented Logan from opening a new clinic within five miles of the RedMed clinic in Oxford, Mississippi, for five years.

¶7.     Two years later, in 2019, Logan scouted a location to open a new clinic in Oxford. He found one and signed a lease for the property. The location was less than one mile from RedMed's Oxford clinic. RedMed's president, Ben Morris, called and informed Logan that

3

he was in breach of the non-compete agreement. Logan claimed to have thought the agreement was for only two years, not five.

¶8. After being informed he was in breach, Logan formed MedPlus Oxford, LLC, with Ronnie Leggitt listed as the owner. Leggitt was Logan's primary investor in the future Oxford location. Logan's other investors for the MedPlus Oxford clinic were M&K Equipment Rentals, LLC, Michael Turner, Karol Turner, Digby Family Holdings, LLC, and Jason Digby. None of the investors were aware of Logan's non-compete agreement with RedMed's Oxford clinic until after the money for the clinic was raised and after the lease was signed in Oxford.

¶9. After the events, a series of lawsuits ensued. In November 2019, Logan sued in Lee County Chancery Court, seeking a declaratory judgment that he was not in breach of the non-compete agreement. In December 2019, RedMed sued John Logan, MedPlus Urgent Clinic, LLC, M2 Billing, MedPlus Oxford, LLC, and Ronnie Leggitt in Lafayette Circuit Court for breach of the non-compete agreement. Ronnie Leggitt was later dismissed as defendant. Upon learning of the agreement, he had demanded the return of his investment and to be disassociated from the Oxford location. In November 2020, M&K Equipment Rentals and its owners, the Turners, sued Logan in Lee County Chancery Court.

¶10. In December 2020, RedMed amended its complaint to add M&K Equipment Rentals, LLC, Michael Turner, Karol Turner, Digby Family Holdings, LLC, and Jason Digby as defendants. They were the remaining members in MedPlus Oxford, LLC, at that time. In January 2021, the Turners and MedPlus Oxford, LLC, filed cross-claims against Logan. In

March 2021, Digby Family Holdings, LLC, and Jason Digby also filed cross-claims against Logan. Additionally, in March 2021, MedPlus Fulton and Oxford Leasing, LLC, sued Logan for breach of fiduciary duties. Oxford Leasing, LLC, is the majority owner of MedPlus Fulton, and its owners are Leggitt, the Turners, and Digby. That same month, the Lee County Chancery Court transferred Logan's initial suit for declaratory judgment to the Lafayette Circuit Court.

¶11. In May 2021, RedMed dismissed its claims against MedPlus Oxford, LLC, M&K Equipment Rentals, LLC, Michael Turner, Karol Turner, Digby Family Holdings, LLC, and Jason Digby. With the dismissals, the parties became oriented as they are in the current appeal.

¶12. On July 8, 2021, the parties and their attorneys met at the Lafayette County Courthouse for the mediation. The session lasted nine hours during which the parties managed to agree to some terms of a settlement agreement. The agreed terms included that John Logan would pay $250,000 in cash to the Turners, pay $275,000 to the Turners in accordance with a promissory note, pay $17,500 in cash to Digby, pledge his interest in MedPlus Urgent Clinic, LLC, to back up an already existing $750,000 note to Leggitt, transfer his interest in MedPlus Fulton to the other members, cease all management and billing functions at MedPlus Fulton, and agree to a five year, five mile non-compete with the Fulton clinic. In exchange, Logan would receive 50 percent of the accounts receivable at the Fulton clinic billed through July 31, and all ongoing litigation would be dismissed.

5

¶13.   Potential terms left unresolved by the proposed agreement were (1) the interest rate and length of time on the promissory note to the Turners, (2) whether the settlement would be confidential, (3) details about the manner of Logan's departure from the Fulton clinic, and (4) the form and substance of the pledge obligation to secure a preexisting note to Ronnie Leggitt.

¶14.   At the end of the session, the attorneys for all the parties individually verbally confirmed their agreement to a list of terms.  The terms were memorialized in a document created by the mediator.  They agreed that all outstanding issues would be resolved by July 31, 2021.  John Logan's attorneys agreed to all of the listed terms, although John Logan was no longer present.  He had left two hours earlier after a heated dispute with the mediator.

¶15.   After the mediation, attorneys for all the parties spent the next two weeks attempting to resolve open issues.  They collectively asked the Lafayette County Circuit Court to stay all proceedings because of the proposed agreement, and the court granted their request.

¶16.   Logan suggested that the $275,000 promissory note to the Turners should be paid over a period of ten years with a 0 percent interest rate.  The other parties rejected the terms and charged that Logan had suggested them in bad faith.

¶17.   On July 29, Logan refused to agree with a revised version of the Settlement Agreement and Release.  In response, on August 2, 2021, the plaintiffs filed a Motion to Enforce Settlement.  The court held a hearing the next month on September 10, 2021.  At the hearing, the attorneys who were present at the mediation all testified.  The attorneys who

6

represented Logan testified that they agreed to a list of black letter terms of the proposed agreement term by term.

¶18. On October 1, 2021, the court granted the Motion to Enforce Settlement, finding that there had been a meeting of the minds between the parties with the intent to contract. The court gave weight to the fact that there had been a neutral mediator who memorialized the agreement with particular terms to which all parties agreed. The court considered that the "parties' subsequent, joint act of executing an agreed order which was submitted to this Court also indicates that a meeting of the minds occurred." Furthermore, the court found that all necessary material terms were present for a contract to be enforced.

¶19. The court then supplied the missing terms. The promissory note would be paid under a five-year term with an interest rate of 4.25 percent. The court gave the parties thirty days to finalize details regarding Logan's departure from the Fulton clinic.

¶20. After the order, Logan filed a Motion to Stay Execution of the Judgment under Mississippi Rule of Civil Procedure 62, and a Motion for New Trial, to Alter or to Amend and Clarify, or Reopen under Mississippi Rule of Civil Procedure 59. The court denied both motions. Logan next filed a Motion for Emergency and/or Expedited Status Conference Hearing and a Motion for Stay Pending Interlocutory Appeal. On November 29, 2021, the court granted a stay and set a hearing date for December 2, 2021. At the hearing, arguments were heard regarding what amount of supersedeas bond should be required for an appeal. On December 17, Logan filed his first, premature, Notice of Appeal, appealing "from every

7

Judgment and Order entered by the trial court in this matter and from every ruling made by the trial court in this matter."

¶21. The court issued two additional orders on December 21, 2021. First, the court denied Logan's request to have the October 18 Order Granting Plaintiffs' Motion to Enforce Settlement deemed a final judgment under Mississippi Rule of Civil Procedure 54(b). Then the court granted a stay pending interlocutory appeal and set the supersedeas bond at $678,125.

¶22. Logan failed to post the supersedeas bond. On January 20, 2022, the court granted plaintiffs' Motion to Lift Stay and ordered the immediate execution of the Order Granting Plaintiffs' Motion to Enforce Settlement Agreement. On January 28, 2022, Logan transferred control of the Fulton clinic to the plaintiffs, and on January 31, checks for $250,000 and $17,500 were delivered to the plaintiffs' attorneys.

¶23. Over the following months, the plaintiffs attempted to ascertain the proper amounts owed to Logan based on the 50 percent of accounts receivable term agreed to in the agreement. Between July 31, 2021, the initially contemplated handover date, and January 28, 2022, the actual handover date, Logan had made various payments to himself. The plaintiffs did not receive full access to the electronic billing system until February 16, 2022. Additionally, between August 16, 2021, and January 27, 2022, while he was still in control of the Fulton clinic, Logan transferred all the clinic's employees to MedStaffing, LLC. MedStaffing, LLC, was a new employment company that Logan formed on August 16, 2021.

8

¶24. On May 5, 2022, the court held a hearing in response to various defense motions and plaintiffs' Motion to Compel or in the Alternative Motion to Include Payment Terms for Promissory Note. Logan had failed to begin payment on the promissory note. Testimony was also heard at the hearing regarding the appropriate amount of accounts receivable collected.

¶25. Following the hearing, the court issued an order granting the motion to compel payment of the promissory note and a Rule 54(b) final judgment decree that confirmed the amount of accounts receivable collected that was owed to Logan. Defendants then appealed to the Court from the final judgment and "all other orders entered by the trial court, and from all bench and other rulings made by the trial court."

## STANDARD OF REVIEW

¶26. "This Court reviews rulings on motions to enforce settlement agreements for abuse of discretion." *Crowley v. Germany*, 268 So. 3d 1277, 1278 (¶ 7) (Miss. 2018) (quoting *Ill. Cent. R.R. Co. v. Byrd*, 44 So. 3d 943, 947 (¶ 11) (Miss. 2010)). "The existence of a contract is a question of fact that is to be determined by a jury, or a trial judge when a trial is conducted without a jury." *Redd. v. Redd (In re Conservatorship of Redd)*, 332 So. 3d 250, 257 (¶ 28) (Miss. 2021) (internal quotation marks omitted) (quoting *Rogers v. Casey & Co. LLC*, 293 So. 3d 857, 863 (¶ 24) (Miss. Ct. App. 2019)). "'A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor,' and his findings are safe on appeal where they are supported by substantial, credible, and

9

reasonable evidence." ***Par Indus., Inc. v. Target Container Co.***, 708 So. 2d 44, 47 (¶ 4) (Miss. 1998) (quoting ***Puckett v. Stuckey***, 633 So. 2d 978, 982 (Miss. 1993)).

## ANALYSIS

¶27.    Despite a lengthy record and convoluted facts, the fundamental question before the Court on appeal is straightforward.  Was an enforceable contract that bound John Logan to its terms formed at the July 2021 mediation?

¶28.    Contract formation requires six elements.  "The elements of a contract are '(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation.'" ***LAGB, LLC v. Total Merch. Servs., Inc.***, 284 So. 3d 720, 724 (¶ 9) (Miss. 2019) (quoting ***Adams Cmty. Care Ctr., LLC v. Reed***, 37 So. 3d 1155, 1158 (¶ 7) (Miss. 2010)).  "A settlement is a contract." ***Hastings v. Guillot***, 825 So. 2d 20, 23 (¶ 12) (Miss. 2002) (citing ***McManus v. Howard***, 569 So. 2d 1213, 1215 (Miss. 1990)).  "It is elementary that in order for there to be a settlement there must be a meeting of the minds." ***Viverette v. State Highway Comm'n of Miss.***, 656 So. 2d 102, 103 (Miss. 1995) (citing ***Thomas v. Bailey***, 375 So. 2d 1049, 1052 (Miss. 1979), *implied overruling on other grounds recognized by* ***Clark v. Neese***, 131 So. 3d 556, 562 (¶ 21) (Miss. 2013)).

¶29.    At the end of the nine-hour mediation, the attorneys for the parties agreed to a list of terms.  The mediator memorialized the event by recording the attorneys and himself with a voice recorder and later having the recording transcribed.

¶30. The potentially unsatisfied contract formation elements at issue here are whether the agreement was sufficiently definite, and whether there was mutual assent. "This Court has long recognized that an agreement must be definite and certain in order to be enforceable." *Etheridge v. Ramzy*, 276 So. 2d 451, 455 (Miss. 1973) (citing 17 Am. Jur. 2d *Contracts* § 75 (1964)).

> The elementary general rule, as frequently enunciated in reference to the enforcement of specific performance of contracts, so far as relates to the particular branch of the subject here presented for consideration, is that the contract must be specific and distinct in its terms, plain and definite in its meaning, and must show with certainty that the minds of the parties had met and mutually agreed as to all its details upon the offer made upon the one hand and accepted upon the other. If any of these requisites be lacking, specific performance will not be decreed by a court of equity.

*Id.* (quoting *Welsh v. Williams*, 85 Miss. 301, 37 So. 561, 561 (1904)). When the terms of a contract are clear and minimally specific such that the parties can comprehend the obligations required and benefits conveyed, and when both parties clearly assent to those terms, a meeting of the minds has occurred. A meeting of the minds is the combination of clarity of what the agreement says and the mutual intent to be bound by the agreement.

¶31. The terms of a contract work together to balance the competing interests of the parties. Agreement to terms by one party is contingent on acquiescence to terms by the other party. Such is the nature of contracting. Until all material terms of a contract are agreed upon, there can be no meeting of the minds and therefore no formation of a contract. Agreement to nine tenths of a contract does not form an enforceable contract on those terms. Rather, the missing terms are a necessary component to the balance of the competing interests in the

11

contract. Mutual assent to a part of an agreement—even a vast majority of an agreement—does not equal mutual assent to the contract as a whole.

### I. The missing interest rate and term were material terms that could not be added by the trial court.

¶32. At the July 2021 mediation, the parties agreed to a few material terms. However, they did not agree to all material terms and some of the terms on which they did agree were insufficiently definite. "A contract is unenforceable if the material terms are not sufficiently definite." *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (¶ 13) (Miss. 2003) (citing *Leach v. Tingle*, 586 So. 2d 799, 802 (Miss. 1991)). While not all essential terms are necessarily material, all material terms are essential. "If any essential terms are left unresolved, then no contract exists." *Hunt v. Coker*, 741 So. 2d 1011, 1014 (¶ 8) (Miss. Ct. App. 1999) (citing *Busching v. Griffin*, 465 So. 2d 1037, 1040 (Miss. 1985)). "If *any essential* term is left open to future consideration, there is no binding contract, and an agreement to reach an agreement imposes no obligation on the parties thereto." *Duke v. Whatley*, 580 So. 2d 1267, 1274 (Miss. 1991) (emphasis in the original) (quoting *Etheridge*, 276 So. 2d at 454). Courts may supply functional, nonmaterial terms to facilitate contract enforcement where a meeting of the minds has otherwise occurred. *See, e.g.*, *Smith v. Mavar*, 198 Miss. 170, 175, 21 So. 2d 810, 811 (1945) ("[W]hen a contract clause fixes no definite time for performance, the law ordinarily implies that performance shall be within a reasonable time, and the court instructed the jury to that effect.")

¶33. We have held that "[p]rice is an essential term that must be stated with specificity." *Rotenberry*, 864 So. 2d at 270 (¶ 13) (Miss. 2003) (citing *Leach*, 586 So. 2d at 802). A

contract cannot be enforced if the price at stake is undeterminable. All parties agree that two of the terms left undetermined by the proposed settlement agreement were the interest rate and term of the promissory note. The interest rate and term of repayment of a promissory note establish the price of the loan it memorializes, and they do so whether the instant situation is a traditional lender situation or not. Diss. Op. ¶ 46. Because we have held that price is an essential term and that lack of an essential term precludes contract formation, the recorded exchange between attorneys at the settlement conference cannot provide the basis of a binding settlement agreement.

¶34. While the dissent's critique that we do not cite caselaw that "holds that the term and interest rate are always material terms" is striking, Diss. Op. ¶ 44, the principle that the court cannot supply price applies equally to the price of a loan. More telling, in the face of what we have written about the materiality of price, is that the dissent cannot cite a case in which we approved a trial court's supplying the terms of a loan when the parties could not agree. Indeed, as discussed below, we have *never* affirmed a trial court that has added any unagreed-upon terms to a contract. The cases from other jurisdictions on which the dissent relies do not support its position. In the Texas Court of Appeals case of ***Somers v. Aranda***, 322 S.W.3d 342 (Tex. App. 2010), a would-be buyer sued for the breach of a contract to purchase a hot tub for $3,040. ***Id.*** at 343-44. The contract at issue was short and made no mention of financing or a loan. ***Id.*** at 345. It provided simply that the purchase money would be made available. ***Id.*** Also, in ***Aranda***, no party disputed that there was a meeting of the minds and a valid contract, which is the issue in the case *sub judice*. ***Id.*** The issue

13

today is not how to handle a valid contract for the loan of money that omits interest rate and term, but whether we have a binding contract at all. In *Ameristar Jet Charter, Inc. v. Cope*, No. 05-99-01875-CV 2001 WL 950978 at *3 (Tex. App. 2001) (not designated for publication), the court only considered the interest rate to be immaterial because there was no testimony that interest was sought. In any event, in none of the cases cited by the dissent did an appellate court affirm a trial court's supplying of an interest rate and term of a loan when the parties did not agree on them.

¶35.    The plaintiffs, citing *Crowley*, 268 So. 3d at 1279 (¶ 8), and *Whatley*, 580 So. 2d at 1273-74, contend that the trial judge could supply the missing loan terms. The trial judge, citing the same cases, did so. However, neither of the two cases nor any other case we have found supports the conclusion that the trial judge can provide terms, to which the parties have not agreed, as essential as the term and interest rate of a loan. Although the *Crowley* Court indeed wrote that courts can supply reasonable terms omitted by the parties during negotiation, *Crowley*, 260 So. 3d at 1277 (¶ 8), the supplying of terms by the court was not an issue there. The issue in *Crowley* was whether persons could be forced to sign a settlement agreement. *Id.* at 1279 (¶ 9). The *Whatley* Court held that the purchase price, or at least a method of computing the purchase price, of real estate could *not* be supplied by the court. *Whatley*, 580 So. 2d at 1273-74. The case cited by the *Whatley* Court, *Mavar*, 21 So. 2d 810, does not, as it turns out, support the proposition that a trial judge can fill in missing terms. There, a party argued that a contract was indefinite as to time for performance. *Mavar*, 21 So. 2d at 811. The *Mavar* Court noted that when a contract does not provide a

14

time for performance, the law provides that "performance shall be within a reasonable time. . . ." *Id.* Accordingly, in the case that lies at the foundation of our pronouncements that a court can supply missing contract terms—*Mavar*, it was the law of contracts that provided a missing term, not the trial court. Indeed, we have been unable to find any case in which the Mississippi Supreme Court has upheld a court-supplied term to a contract.

**II.** **The final exchange between the attorneys and the mediator during the mediation indicates that no meeting of the minds sufficient to form a binding settlement agreement occurred.**

¶36. At the end of the mediation, a discussion between the mediators and attorneys occurred regarding Logan's exit date from RedMed.

> Mediator: I will say no to that – you have an agreement to conclude this transaction on or before July 31, 2021. What you haven't reached is an agreement in terms of how he will announce his leaving, etc.
>
> First Attorney*: But the other terms are enforceable*? And what date he is leaving by?
>
> Mediator: Again,
>
> First Attorney: No, I just want to be very clear – I want to make sure we are all on the same page – I am not trying to buck the . . . .
>
> Second Attorney: He leaves no later than July 31 would be . . .
>
> First Attorney: . . . and I think that is the way I will take it, as well – I mean based on these terms – don't you, Goodloe?
>
> Third Attorney: Yes.
>
> Mediator: Okay – hang on.
>
> Second Attorney: Okay, I don't know why he would have the option to stay until July 31st – I understand he was asking for nine (9) days earlier . . . once he gets back from vacation – so, surely there can be a prior date – and frankly,

15

*I don't really know how we can have an agreement* with regard to Fulton itself without an agreement on that part . . . when he is turning over and leaving or out—so *I am really conflicted about that whole agreement itself*, because to me *that is a key term – when he gets out and how he gets out*–so . . . .

Mediator: Based on that statement – this is Bobby again – *we don't have an agreement at all* – so I can just delete all of this.

First Attorney: He has to be gone by the 31st, whatever that role is, he's got to he gone by then and he may be gone before then.

Second Attorney: Right. I want him out today. You know he wanted to be out in August, and now we have this 7/31 date out there. I'm not trying to confuse anybody, but I just want everybody in this room, all these men, everybody to know where we stand, and I don't want anybody to leave without . . . .

Mediator: Chandler, it is easy to say that, but *when we dictated all of this and then you come in and lay a comment like that on the back-end of it, it sounds like we don't have an agreement.*

First Attorney: I'm not trying to screw things up I swear . . . .

(Tape Ends)

(Emphasis added.)

¶37. "The assent of the parties in the formation of a contract must necessarily be gathered from their words, acts and outward expressions." ***Hill v. Capps***, 248 Miss. 601, 611, 160 So. 2d 186, 190 (Miss. 1964) (citing 17 C.J.S. *Contracts* § 32). The above-quoted exchange took place immediately after the first attorney questioned whether the previously discussed terms were enforceable and indicates that at least one attorney decided not to assent to the settlement agreement. It also took place well after Logan, the party to the litigation who had settlement authority, had left. Here can be found the revocation of assent the dissent claims is missing. Diss. Op. ¶ 51. The mediator twice expressed that, in the end, there was no

16

agreement after an attorney brought up the failure of the parties to agree to a material term. It is clear that the parties considered Logan's departure date to be material to the settlement, and it is equally clear that no agreement was reached. "A fundamental principle of contract law is that the mutuality of assent to the terms of a contract may be shown by the acts or conduct of the parties where a signature is lacking." *Slater-Moore v. Goeldner*, 113 So. 3d 521, 526 (¶ 11) (Miss. 2013) (citing *Turney v. Marion Cnty. Bd. of Educ.*, 481 So. 2d 770, 774 (Miss. 1985)). Here, we not only have the lack of a signed settlement agreement, but the conduct of the attorneys and mediator quoted above directly refutes mutuality of assent. Statements following mediation characterizing what occurred there as providing a "proposed settlement" or "what appears to be a settlement" or "at least the frame of a settlement" or agreement as to some material terms of a settlement do not, as the dissent asserts, Diss. Op. ¶ 50, show that a meeting of the minds occurred. Instead, they cast even more doubt on whether any real agreement was reached.

¶38.    "[T]his Court will not draft a contract between two parties where they have not manifested a mutual assent to be bound." *A. Copeland Enters. v. Pickett & Meador, Inc.*, 422 So. 2d 752, 754 (Miss. 1982). In the case *sub judice*, the parties indeed agreed to some material terms on their way to forming what might have become a binding contract, but they never agreed to be bound by the agreement as a whole. The mediation transcript shows that negotiations broke down before the parties could agree to be bound by the whole agreement and before the parties could agree to material terms related to the earlier-agreed-upon facets

of the settlement. Because we find the lack of contract formation dispositive, we do not reach Logan's other issues.

¶39. **REVERSED AND REMANDED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., ISHEE AND GRIFFIS, JJ., CONCUR. CHAMBERLIN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MAXWELL AND BEAM, JJ.**

**CHAMBERLIN, JUSTICE, DISSENTING:**

¶40. I disagree with the majority and would instead affirm the trial court's finding that there was an enforceable settlement agreement as to all material terms. As the reviewing Court, we "must examine the entire record and must accept, 'that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact.'" *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 47 (Miss. 1998) (quoting *Cotton v. McConnell*, 435 So. 2d 683, 685 (Miss. 1983)). Whether there is evidence contrary to the trial court's finding is irrelevant so long as the factual determination of the trial court is supported by "substantial, credible, and reasonable evidence." *Id.* (citing *Puckett v. Stuckey*, 633 So. 2d 978, 982 (Miss. 1993)).

¶41. When deciding whether to enforce the settlement agreement, the trial court found that "[t]he points of dispute raised now by Defendant Logan regarding the particulars of the promissory note and his actions related to withdrawal from MedPlus Fulton, LLC are ancillary considering the nature of the claims and the settlement agreement." The Court then supplied a term of five years and an interest rate of 4.25 percent to the promissory note for

18

the agreed amount of $275,000. The court also required any additional terms and conditions as to Logan's departure from the practice to "be finalized within thirty (30) days from the entry of this Order." The trial court did not abuse its discretion by making this finding.

¶42. We note that "[s]ettlement agreements are contracts[.]" *Chantey Music Publ'g, Inc. v. Malaco, Inc.*, 915 So. 2d 1052, 1056 (Miss. 2005) (citing *East v. East*, 493 So. 2d 927, 932-33 (Miss. 2005)). This Court has stated that parties "may fully agree upon terms of a contract knowing there are other matters on which they have not agreed and on which they expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable contract." *Busching v. Griffin*, 542 So. 2d 860, 863 (Miss. 1989) (quoting 1 Corbin, *The Law of Contracts* 94-95 (1963)). Here, it was a complex settlement agreement that allowed for the transfer of more than a million dollars in property, enumerated sixteen separate large issue items, and resolved five separate court cases. As the trial court noted, "[v]iewing the settlement agreement as a whole, the parties agreed to settle all claims with particular figures. These figures are material, including not only large sums of money but also detailed geographic and time restrictions related to Defendant Logan's noncompete agreement."

¶43. Regarding the promissory note, Logan agreed to pay the Turners "[a] balance payment of $275,000" on a "Promissory Note executed by Logan and secured by a Pledge Agreement of Logan's interest in Tupelo. The Pledge Agreement and Note shall be in a form and substance agreeable with counsel." This promissory note was in addition to Logan's agreement to pay the Turners and RedMed $250,000 in cash.

19

¶44. The majority finds that because there was no interest rate and term prescribed to the promissory note, the parties did not reach an agreement as to all material terms. The majority does not cite any caselaw that holds that the term and interest rate are always material terms. Indeed, this Court has never held that the term and interest rate on a promissory note are always material terms.

¶45. This Court allows trial courts to supply nonmaterial terms such as the time of performance. *Duke v. Whatley*, 580 So. 2d 1267, 1273-74 (Miss. 1991) (citing *Smith v. Mavar*, 198 Miss. 170, 175, 21 So. 2d 810, 811 (Miss. 1945)). The majority traces the lineage of our caselaw directly to a case that supports a finding that a time for performance is not necessarily a material term. Just as the Court in *Mavar* considered a contract to be enforceable without specification of time of performance, so too this Court should consider the promissory note in this case to be enforceable even though it lacked such specification. Maj. Op. ¶ 35 (citing *Mavar*, 21 So. 2d at 811).

¶46. As for the interest rate, I find that it was not a material term to this agreement. This is not a traditional lender scenario. In a traditional lender scenario, the lending company's profit is obtained from the collection of interest. But this is not a traditional lender scenario. Here, interest is not the goal. The Turners' goal is to collect $275,000 from Logan as damages they claim to have suffered and, in turn, settle multiple lawsuits. The material term here is the amount of the balance payment that was agreed to by the parties for restitution. Material terms should be "determined on a case by case basis." *Somers v. Aranda*, 322 S.W.3d 342, 345 (Tex. App. 2010) (citing *Inimitable Grp. v. Westwood Grp. Dev.*, 264

20

S.W.3d 892, 899 (Tex. App. 2008)); *see id.* ("We further note that this is a suit for money damages, not specific performance, and less certainty is needed to render it enforceable." (citing ***Ski River Dev., Inc. v. McCalla***, 167 S.W.3d 121, 133 (Tex. App. 2005))); ***Vela v. Vela***, No. 14-12-00822-CV, 2013 WL 6700270, at \*5 (Tex. App. 2013); ***Ameristar Jet Charter, Inc v. Cope***, No. 05-99-01875-CV, 2001 WL 950978, at \*4 (Tex. App. 2001) ("Because there is no testimony or pleading indicating Ameristar sought interest on the value of the training from Cope in its alleged oral contract, the rate of interest could not be a material term."); ***Rohaley v. Compere***, No. S-11004, 2004 WL 2260293, at \*5 (Alaska 2004).[1] While the Turners obviously would not be opposed to the collection of interest, and have requested and been awarded it, the material term was the collection of the balance payment, not the profit off the interest. In other words, the promise to pay the money to resolve the lawsuits is what was material.

¶47.    This Court should not assume that the interest rate was a material term. Even Logan, in his brief, submitted to this Court that per Mississippi Code Section 75-3-104(a) (Rev. 2016), a promissory note under the Uniform Commercial Code is not statutorily required to bear interest. *See* § 75-3-104(a) ("'negotiable instrument' means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges[.]"). The majority would find that interest was material even though not discussed by the parties nor required by law but, rather, because Logan says it is so. I disagree. The trial court did not

---

[1]Although from other jurisdictions, the logic in these cases is persuasive.

21

abuse its discretion by finding that the above agreement included all material terms and that it could supply reasonable ancillary terms for the note.

¶48. Logan argues, and the majority agrees, that an additional unagreed material term was his method and manner of leaving. RedMed counters that his manner of leaving was not material to the agreement; instead, the material term, which was agreed to, was that Logan would exit MedPlus Fulton as manager, biller and owner by July 31, 2021. The majority finds that the parties did not agree upon Logan's departure date of July 31, 2021. Maj. Op ¶ 36. It is clear from the settlement agreement that the parties agreed that "Logan will be allowed to return to the Clinic at any day prior to July 31, 2021 to discuss his departure from the Clinic with the Clinic employees." Further, Logan agreed to each line of the settlement, one of which stated that "[t]he transaction will be closed on or before July 31, 2021." It is clear that the date was agreed upon. RedMed contends that Logan breached this term of the settlement by failing to leave the clinic until January 28, 2022. The trial court determined, after hearing testimony from both attorneys and renewing the record evidence, that the method and manner of Logan's departure was "ancillary considering the nature of the claims and the settlement agreement." This is a factual determination which was best left to the discretion of the trial court. *Par Indus., Inc.*, 708 So. 2d at 47. The trial court heard the evidence and made the factual determination as to the parties' intent.

¶49. There was a clear meeting of the minds at the settlement conference that was memorialized by the mediator's dictation. Although the parties were working to fully flesh out the final document memorializing the agreement, this does not excuse them from

performing the agreed material terms. Further, "a stipulation to reduce a valid written contract to some other form does not affect its validity, and the stipulation may not be used by either of the parties for the purpose of imposing upon the other the additional burdens or obligations or of evading the performance of any of the provisions of the contract." *Vicksburg Waterworks Co. v. J.M. Guffy Petroleum Co.*, 86 Miss. 60, 38 So. 302, 304 (1905) (internal quotation mark omitted) (quoting 1 Beach, *Mod. Law of Contracts*, § 2).

¶50.    The parties' meeting of the minds was further evidenced by their actions. Attorneys for both Logan and RedMed testified at the hearing on the determination of the motion to enforce the agreement that they had verbally agreed to each of the terms at the mediation, line by line. After the mediation on July 8, 2021, Chandler Rodgers, attorney for Logan and M2Billing Co. sent an email that evening stating that "In light of what appears to be a settlement, I suggest we enter into an Order staying all deadlines . . . " Rusty Comely, attorney for RedMed, LLC, and Covenant Investment Series II, Inc., responded with, "we have a settlement as to the material terms [the mediator] dictated and to which the lawyers agreed." The following morning of July 9, 2021, Goodloe Lewis, attorney for MedPlus Urgent Clinic, LLC, and Michelle Bryan asked, "Do I understand that you have at least the frame of a settlement agreement?" As the trial court noted, "*all parties* executed an agreed order with this Court advising that 'mediation has resulted in a proposed settlement to be consummated on or before July 31, 2021.'"

¶51.    Notably, what is lacking from the record evidence of emails and mediation dictation is a revocation of assent by any of the attorneys. The parties did not express an intent not to

23

be bound.  Even the portions quoted by the majority lack a clear statement by the parties that they were officially withdrawing from settlement negotiations.  The majority finds that the mediator's question to the parties indicates there was no meeting of the minds.  The attorneys' responses, however, indicate otherwise.  "I'm not trying to screw things up I swear . . . " is not language that an attorney uses to indicate a clear revocation of assent.  The quotation is proof of ongoing negotiations during the mediation as to the material terms.  "Moreover, the law favors the settlement of disputes by agreement of the parties and, ordinarily, will enforce the agreement which the parties have made, absent any fraud, mistake, or overreaching." *Chantley Music Publ'g, Inc.*, 915 So. 2d at 1055 (citing *Hastings v. Guillot*, 825 So. 2d 20, 24 (Miss. 2002)).  Logan's changing his mind after reaching an agreement as to all material terms does not invalidate the settlement agreement.  Further, Logan's exiting the mediation during settlement negotiations does not negate the legitimacy of the authority, actual or apparent, that was vested in his attorneys to reach a settlement.

¶52.    "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Ethridge v. Ramzy*, 276 So. 2d 451, 455 (Miss. 1973) (quoting Restatement (Second) of Contracts § 32 (Tent. Draft No. 1, 1964)).  The reasonable certainty of the agreement is further evidenced by the fact that Logan has fulfilled obligations under the agreement, and RedMed has argued the breach of specific terms.  The clinic has changed hands, and sums have been paid.  If this Court reverses the trial court's discretionary decision that is supported by ample record evidence and caselaw, the clinic will be returned to Logan, and the sums of $250,000 to the Turners

24

and RedMed and $17,500 to Digby will have to be returned.[2]  Various administrative and billing companies will have to transfer ownership and control back to Logan.  I find that the execution of the agreement under the agreed terms is further evidence that there was a full settlement agreement with certain material terms.

¶53.    The trial court did not abuse its discretion by supplying nonmaterial reasonable terms. In this case, the terms of the settlement agreement were reasonably certain, and the trial court did not abuse its discretion by enforcing them.

**MAXWELL AND BEAM, JJ., JOIN THIS OPINION.**

---

[2]Logan's specific request to this Court is to "remand this matter with instructions to restore the status quo ante before entry of the October 18, 2021 Order, including immediate return of the clinic to Mr. John Logan, return of the $250,000.00 paid to Turner and RedMed, return of the $17,500.00 paid to Digby[.]"